Davis, J.,
delivered the opinion of the court:
This claim, one of the class popularly called “ French spoli-ations,” springs from the policy of the French revolutionary government between the execution of King Louis XVI and the year 1801, a policy which led to the detention, seizure, condemnation, and confiscation of our merchant vessels peacefully pursuing legitimate voyages upon the high seas. Over ninety years have these claims been the subject of discussion and agitation, first between the two nations, and then between the individuals injured and the Government of the United States. Prolonged and heated negotiation resulted in the treaty of 1800, by which, it is urged on behalf of the claimants, their rights were surrendered to France for a consideration valuable to this Government. The claims being valid obligations admitted by the French Government, they contend that the United States, through this agreement, in which demands of the one nation were set off against those of the other, assumed as against their citizens these obligations and should pay them. This position is denied by the Government, which in addition presents other defenses based upon subsequent transactions between the two countries, urging that thereby were destroyed any beneficial rights possibly vested in the claimants, if their contention as to the treaty of 1800 be correct.
The act sending the claims to this court, while the third that has passed both Houses of Congress, is the first that has received the approval of a President, as one was vetoed by President Polk, another by President Pierce, while this, the third, was signed by President Arthur.
Whatever the rights of the claimants, they are without remedy other than that which Congress may have seen fit to give them; and our power to grant redress, be our opinion as to the justice of their claims what it may, is limited by the terms *344 of the remedial statute. The force and effect of the act, by virtue of which the claimants appear at this bar seeking relief, must then be examined at the threshold of the discussion. The act authorizes “ citizens of the United States or their legal representatives,” having “ valid claims to indemnity upon the French Government arising out of illegal captures, detentions, seizures, condemnations, and confiscations,” prior to the ratification of the conventipn of 1800 with France, to apply here within a time limited (§ 1), that (§ 3) this court may “examine and determine the validity and amount” of their claims, the present ownership, and, if owned by an assignee, certain details in regard thereto. The act excludes from its benefits claims embraced in certain conventions with France and Spain, concluded in 1803,1819, and 1831, and with provisions as to rules of court, defense of the United States, evidence and other matters not important for our immediate purpose, directs this court, as to the claims thus placed within our jurisdiction, to report to Congress the first Monday of each December the facts found by us and our conclusions, which are to be taken, both as to law and facts, as advisory and not conclusive upon either party, the claimants or the Government.
So peculiar a jurisdiction was probably uever before conferred upon a strictly judicial tribunal. The rights of the claimants, if any exist, arise from the acts of the political branch of the Government done in the protection and aid of the nation. For such rights there can be no remedy other than that granted by the legislature; in this instance the legislature has elected to transmit to the judiciary, under certain restrictions, the examination of the claimants’ demands, with the proviso that the conclusion reached in this forum shall not be finally binding upon either party, but that the defendants, as well as the claimants., have reserved to them an appeal, not in the regular line of judicial procedure to the Supreme Court of the United States, but back again to that body, from which alone any remedy can come to the citizen for wrongs done him by his Government.
The reason for this peculiar grant of remedy is found in the nature of the claims, which spring from international controversies of the gravest character intimately entwined with the history of our struggle for independence; also in the age of the claims; and, lastly, in the absolutely indeterminate amount of *345 financial responsibility which will be thrown upon the Government should the claims be found to exist as valid obligations due from the United States to their citizens. Good or bad, not one of these claims is enforceable but by the consent of the Congress, and the Congress can affix to that consent such condition as in their wisdom seems just and for the best interests of the Republic. The remedy now granted is an examination and advisory report by the judiciary, to be followed by a decision by the legislative branch of the Government.
It has been said that the validity of the claims as a class is admitted by the act, and this court should' confine the examination to each individual claim for the purpose only of determining whether it falls within the class. This is understood to be in effect the argument on behalf of some of the claimants. Our labor and responsibility would be greatly lightened could we agree with this proposition, but the act of Congress seems clearly to negative the contention, and to throw upon us the duty of investigating the validity of these claims against France and the assumption of them by the United States. It requires us to examine, not claims in a specified category or known by a generic name,not even “claims” simply, but “valid” claims against France, and valid claims arising not merely from captures, detentions, seizures, condemnations, and confiscations, but from acts of this nature -which were “ illegal.” The validity of the claims, as against France, is the very first condition imposed by the legislature upon the grant of remedy. The claims must have been “valid” obligations existing at the time and which this Government had the right to enforce diplomatically before they come within the purport of the statute. To grant as correct the contention that we are to examine in each case whether, and only whether, the seized or detained vessel had violated the law of nations or the treaties — as, for illustration, drawn from the argument, whether she carried contraband of war, or attempted to break an actual blockade, or failed to carry proper papers — if we are to examine only into this, then effect is perhaps given to the word “ illegal,” found in the statute defining the nature of the acts from which the claims arise, but the word “ valid,” of equal if not superior force, is entirely ignored.
Clearly Congress expects from us an opinion as to the validity of claims of this class as against France, and the third *346 section of the act, which requires us to receive “ historic and documentary evidence*” “to decide upon the validity of said claims accordingto the rules of law, municipal and international, and the treaties of the United States applicable to the same,” and to report “all such conclusions of fact and-law as in [our] judgment may affect the liability of the United States therefor,” is not only confirmatory of this conclusion, but obliges us to go further and to examine into the resultant liability claimed to exist in the Government of the United States to compensate the claimants for the injuries alleged to have been sustained at the hands of the French Bepublic. This involves an examination of the history of the relations between the two countries from 1777, when negotiations for the treaties of alliance and commerce began, as the whole contention starts with the treaties of 1778 with France, which came to us during the darkest hours of the struggle for independence, and when we were hoping against hope for the aid which there was no prospect of receiving.
Burgoyne had capitulated, Howe had been driven from New Jersey, and, after the drawn battle of Germantown, was shut up in Philadelphia, where the ease and luxury of a city camp were but occasionally interrupted by an excursion against the enemy on land or an encounter upon the river. Curiously enough, at the end of a successful campaign, the American cause was, barring the indomitable spirit of the patriots, in the direst straits.
Gates, excited by his success at the north and become the president of the executive board of war, had broken with "Washington and had used his influence successfully in securing the appointment as inspector-general, against Washington’s earnest protést, of a man who hacf openly defied the commander-in-chief. Washington’s army of less than nine thousand men, lying at Valley Forge, was violently assailed by the .State of Pennsylvania for not prosecuting an active winter campaign, while even in Congress,' to which the remonstrance of the State’s council and assembly had been addressed, there was deep discontent as to the policy of the commander-in-chief and sharp criticism upon his conduct. In Philadelphia the British, lodged in comfortable houses, were surrounded by every luxury which a full purse a-ud communication with the outer world could afford; while in the Continental camp, as Wash *347 ington wrote to Congress, the army was so reduced by cold and starvation, that unless some capital change took place it must “ starve, dissolve, or disperse.” In Philadelphia there was every comfort and almost every means of dissipation; at Yalley Forge nearly three thousand men were unfit for duty because they were barefooted “and otherwise naked” (Sparks’s Washington, vol. 5, pp. 197-203), while many were in the hospitals and farm-houses wanting clothes and shoes (ib.). So desperate was the situation that General Huntington preferred fighting to starving, his brigade being out of provisions, while General Yarnum, quoting the saying of Solomon that “hunger will break through a stone wall,” added, “three days successively we have been destitute of bread; two days we have been entirely without meat. The men must be supplied or they cannot be commanded.” (Ib., 193.)
This condition of his severely-tried army Washington represented to Congress eloquently and repeatedly. Practically that body did nothing to remedy the evil, but on the other hand suggested the propriety of attacking Philadelphia, while an expedition of 1,000 men was, against Washington’s judgment, detached for an invasion of Canada.; an expedition abundantly supplied with commanders in the persons of three major-generals, but unfortunately lacking in such necessary military details as food, clothing, and transportation. (Bancroft, vol. 9, ch. 27). The financial condition of the country was in harmony with the physical condition of the army, and the issue of eight and one-half millions of paper money caused an enormous depreciation in the value of the currency, increased the feeling of financial insecurity and necessarily impaired the credit of the Government. The army was small, insufficiently fed, paid, and clad; before them was a strong, rich, and prosperous enemy; the Government was weak, the currency suspected, while disaffection, discontent, and jealousy wrere prevalent among the highest officers.
Such was the close of the year 1777 at home. Hardy, determined, patriotic, self-sacrificing as the sturdy revolutionists were, probably some way would have been found' out of these apparently overwhelming misfortunes; howr, no one at that time could possibly foresee. Belief was, however, after weary come from a quarter where it had long been expected ith hope constantly deferred.
*348 Franklin bad early established indirect and secret relations with the court of France through his friend Dumas, a Swiss man of letters residing chiefly in Holland, who was a devoted Adherent of the American cause, and- who early advised an alliance with France and Spain, it being to their interest that the United States should be independent of England, “whose enormous maritime power [filled] them with apprehensions.” In 1776 Silas Deane was' sent out as a political agent, and he soon opened secret and informal relations with the French department of foreign affairs. He could not succeed in obtaining from France any open action, but his purchase of munitions of war and supplies, and his many other acts in direct violation of strict neutrality were permitted, winked at, and encouraged. He was told that it was for the interest of both countries “to have the most free and uninterrupted intercourse,” but that, the understanding with Britain being good, there could not be recognition of the shipping of military supplies and stores.
Practically in this condition did matters remain after the arrival of the' commissioners (Franklin and Lee), although they also constantly pressed the argument contained in the instructions to Deane, namely: France is the country it is fittest for us to obtain and cultivate; the commercial advantages Britain has enjoyed with the colonies have greatly contributed to her wealth and importance; a great part of that commerce will fall to France, especially (and here is the key of the negotiation) if she favors us now, for our trade is rapidly increasing, our population is rapidly increasing, we are waxing strong and rich, with a great future before us ; why not step in now, even at the cost of war with England, a war which under any circumstances you momentarily expect.
French popular sentiment was with us, but to the popular clamor, delicately excited by the astute diplomacy of Franklin and his colleagues, was opposed the clear and calm judgment of the King’s advisers, men who conceived it their duty to obtain for their master every advantage possible from the struggling colonies at the least possible expense and risk. Supplies and stores were furnished, but the assistance was not acknowledged ; munitions' of war found their way across the Atlantic, while the fact was denied to England, and although some of these very supplies came from the arsenals of the Government, that fact even was denied to our own representatives who had *349 forwarded them, and wbo, as matter of course, knew as much of the transaction as the minister who permitted and disavowed it. Day after day without tiring did Dumas, Deane, Franklin, and Lee press for open action on the part of France. Steadily did they receive promises and secret aid, but always'were they postponed as to the great step which should produce France openly to the world as the ally of the colonies and the avowed enemy of England. Before the eyes of Count Yergennes was successfully dangled the bait of a practically exclusive share in American commerce, but still he hoped to secure this advantage without an open rupture with England.
In this condition did matters rest until the news arrived of Burgoyne’s defeat. This news, which reached France_ early in December, 1777, “apparently occasioned as much general joy as if it had been a victory of their own troops over their own enemies.” (The commissioners to Committee on Foreign Affairs, Paris, December 18,1777.) The negotiations instantly took so long a stride forward that before the 18th of December it was decided to conclude a treaty of amity and commerce, the King becoming fixed in his determination to acknowledge and support the independence of the colonies by every means in his power. Nothing could be more generous and liberal than the whole tone and manner of the French negotiation from this time. Once decided and committed as to the policy of openly supporting the colonies, there were no half-spirited measures, no halting at petty details, no discussion of unimportant trifles, but a generous and open support; nevertheless, it was not until Gates’s victory at Saratoga had seemed to turn the tide of events, and while still in ignorance of the want and suffering at Yalley Forge, that this action, so vital to the future of the American ltepublic, was taken. The war for independence was with the assistance of France prosecuted to a successful issue, and at Yorktown the surrender of Cornwallis was made to the combined armies of Washington and Bochambeau under the guns of the fleet of De Grasse.
This brief view of the situation, rehearsing, as it does, details of most familiar history, is only of importance as it relates to what may be called sentimental points made in the argument. The treaties of 1778 were made in obedience to a popular demand in France; they were made for a consideration then deemed valuable by France, and at a moment which then seemed op- *350 por tune, to France; but they camp to us when the tide was appai’ently turning against us, and the aid they promised was generously given us.
The 30th day of November, 1782, provisional articles of peace, acknowledging the thirteen former colonies “ to be free and independent,” were signed at Paris by the representatives of the United States and Great Britain; the 20th of January, 1783, a cessation of hostilities was declared, and the 3d of September, 1783, the definitive treaty of peace was concluded. France had thus given the major portion of the consideration offered by her for the contract of 1778, and the United States were free, sovereign, and independent, as she had stipulated they should be.
The treaties of 1778 were two in number; that of “alliance,” the one of most immediate, and, in fact, at the time, of absolutely vital importance to the United States ; and that of “ amity and commerce.” While sepai ate instruments, they were concluded upon the same day, were the result of the same negotiation, signed by the same plenipotentiaries, and are, in diplomatic effect, one instrument. The treaty of alliance, after referring to its companion, the treaty of commerce, states that the two powers “have thought it necessary to take into consideration the means of strengthening the engagements therein made,” and of “ rendering them useful to the safety and tranquility of the two parties ; particularly in case Great Britain, in resentment of that connection, * * * should break the peace with France, either by direct hostilities or by hindering her commerce and navigation in a manner contrary to the rights of nations and the peace subsisting between the two crowns;” and the two powers resolving in such case to join against the common enemy determined upon the treaty, which provided that if war should break out between France and Great Britain during the war for American independence, each party should aid the other according to the exigencies, as good and faithful allies; that the essential end of the alliance, called a “ defensive” alliance, was the “liberty, sovereignty, and independence, absolute and unlimited, of the United States.”
Provision was also made for a possible conquest of Canada, Bermuda, and the islands in the Gulf of Mexico, and each party was forbidden to conclude a truce or peace with Great Britain without the consent of the other. It was further agreed that *351 neither should lay down arms until the independence of the United States was assured by treaties, terminating the war. No claim was to be made by one against the other for compensation, whatever the result, and then came the guarantee, out of which afterwards arose so serious complications, national and international, which not only drove our country, weak and exhausted from seven years’ strife, to the verge of war, but also stirred up at home a bitter political contest, carried even into the intimacy of a President’s Cabinet.
These stipulations are contained in the. eleventh and twelfth articles, whereby each party guaranteed “ forever against all other powers” — first, the United States to France: all the possessions of France in America as well as those it might acquire by any future treaty of peace; second, France to the United States: “their liberty, sovereignty, and independence, absolute and unlimited,” together with their possessions and their additions or conquests made from Great Britain during the war. Such, in substance, was the treaty of alliance; it has never been contended, so far as known to us, that France did not fulfill the requirements which this instrument imposed upon her during our comest with Great Britain.
The provisions of the other agreement, the treaty of commerce, of importance in this case (alluding to them briefly) required protection of merchantmen; required ships of war or privateers of the one party to do no injury to the other; and provided especial, purely exceptional, and exclusive privileges by each party to the other as to ships of war and privateers bringing prizes into port.
The treaty of alliance was not one-sided, for it imposed upon the United States a possible duty and burden in the fulfillment of the guarantee of French possessions in America “ forever ” against all other powers. This issue was presented without delay. The French revolution began; in 1793 the King was beheaded, when France was instantly brought face to face with the powers of Europe, and her possessions in America were soon wrested from her.
England was in the vanguard of the war, a rub concluded twenty-three treaties with her allies, in which they agreed to starve out the common enemy. To this end was it stipulated that all the ports should be shut against France; that no provisions should be permitted to be exported to France, and that *352 these measures should be continued and others employed for the purpose of injuring French commerce and to bring that nation to just conditions of „ peace. (Treaty between Great Britain and Prussia, July 14,1793.) The animus of the alliance is further shown in the instruction of the Czar, who directed his admiral, in fulfillment of stipulations with Great Britain, to prevent the French from receiving supplies, and to that end to seize all French vessels and to send back to their own ports all neutral vessels bound to France, stating that while these measures were not “ strictly conformable to the natural laws of war” they were justifiable when employed against “ those arrant villains, who have overturned all duties observed towards God, the laws, and the Government; who have even gone so far as to take the life of their own sovereign.”
All Europe, except Sweden and Norway, was now arrayed against the new Republic in a bitterness of warfare scarcely with parallel, and which openly descended to an attempt to starve the French people into submission through an attack upon neutral commerce, a course admittedly unjustified by the laws of war. . Naturally France looked to the United States for aid, relying upou the pledge of the treaty of 1778 and the assistance rendered us in our scarcely-concluded struggle by her fleet, armies, and treasury.
The commercial relations between France and the United States v?ere already most unsatisfactory. Exceptional favors grantedhhe United States in 1787 and 1788 (Foreign Relations, vol. l,pp. 113-116) had been withdrawn and the equality upon which French and British vessels were put in our ports had excited jealousy. “ No exceptional advantages had come to France from the war of the revolution, and American commerce had reverted to its old British channels.” (Treaties and Conventions, &c., Bancroft Davis, 985.)
Jefferson, who had been transferred from the legation in Paris to the office of Secretary of State, endeavored to secure the conclusion of a new commercial treaty, but unsuccessfully, and in April, 1792, we find him instructing Mr. Morris that “it will, be impossible to defer longer than the next session of Congress some counter regulations for the protection- of our navigation and commerce. I must entreat you, therefore, to avail yourself of every occasion of friendly remonstrance on this subject. If they wish an equal and cordial treaty with us we are ready to *353 •enter into it.” (Jefferson’s Works, vol. 3, p. 356.) In June be again writes that “ we cannot consent to tbe late innovations without taking measures to do justice to our own navigation” jib., 44!)), and after tbe imprisonment of tbe King be informed Morris that some matters, sucb “as reforming the unfriendly restrictions on our commerce and navigation,” might be transacted even by tbe revolutionary government, as a government de facto. (Ib., 489.)
Tbe new French minister, M. Genet, started for tbe United States in the spring of 1793 armed with three hundred blank commissions “to distribute to such as [would] fit out cruisers in our ports to prey on tbe British commerce.” (Foreign Eo-lations, vol. 1, p. 354.) Finally, tbe condition of affairs caused by the war led to the President’s proclamation of neutrality, from which, curiously, and by way of compromise, tbe word “ neutrality” was omitted. (Jefferson’s Works, vol. 3, p. 591.)
Genet arrived in tbe United States tbe 8tb of April, and on tbe 22d of that month tbe proclamation was issued declaring that “tbe duty and interest of tbe United States require that they should with sincerity and good faith adopt and pursue a conduct friendly and impartial towards tbe belligerent powers.”
Already at Charleston, where he landed, Genet bad commissioned privateers and sent them to sea, asserting this action to be authorized by tbe treaty of 1778, and informing tbe Secretary of State.of his wish that tbe Federal Government “should observe, as far as in their power, th| public engagements*contracted by both nations ; and that by this generous and prudent conduct they will give at least to the world the example of a true neutrality which does not consist in the cowardly abandonment of their friends in the moment w.hen danger menaces them, but in adhering strictly, if they can do no better, to the obligations they have contracted with them.” (Foreign Eela-tions, p. 151.)
In September following Genet asked for fire-arms and cannon to protect the French possessions guaranteed by the United States, but he was answered by the Secretary of War, with what he terms “ an ironical carelessness,” that “ the principles established by the President in his proclamation did not permit him to lend us so much as ‘ a pistol.’ ” (Senate Doc. 102,19th Gong., 1st sess., p. 219.)
*354 Tbe French law of May 15,1791, which u inhibited Americana from introducing, selling, and arming their vessels ” in France^ and “from enjoying all the advantages allowed to those built in the ship-yards of the Republic,” was suspended by the national convention the 19th day of February, 1793, wheu extensive privileges were granted our commerce (ib., 35), but in less than three months (9th May, 1793), seventeen days after the-date of the President’s proclamation, but before news of its contents, could have been received, the National Convention issued a decree ordering the arrest of any neutral vessels laden-with provisions bound to,an enemy’s port. That this was an-open and palpable violation of neutral rights was not denied, for it was a measure understood to be retaliatory to the course pursued by Great Britain, and compensation was promised to-those neutrals who should suffer by its operation. (Ib., 42.)
This decree of May 9, 1793, authorized French vessels of war and privateers to arrest neutral vessels laden with provisions, the property of neutrals, but destined to an enemy’s port, or laden with enemy’s merchandise, the merchandise to be prize, and the neutral provisions to be paid for, together with proper freight and indemnity for delay. The 23d of the same month American vessels were exempted from the operation of this decree (Foreign Relations, vol. 1, p. 244); five days later this second decree was suspended; July 1 it was again put in force ¿ and July 27 it was repealed, leaving the decree of May 9 finally in force as against American commerce. (Id., vol. 3, p. 284.). Our' minister remonstrated, and the natioual assembly vacillated ; nevertheless the decree was executed in plain and admitted violation of neutral rights.
The decree of May 9,1793, and that of November 18, 1794,. directed the seizure of neutral vessels containing enemy’s-goods, although the treaty of 1778 expressly provided that ‘‘free ships make free goods” (Art. 23, Treaty of Commerce),- and further, under an ordinance of 1744, revived for the purpose, a foreign vessel having on board a supercargo or officer from an enemy’s country, or whose crew was by more than one-third subjects of an enemy, was adjudged prize. Mere clearance for some of the West India Islands, by decree of February Í, 1797, subjected neutral vessels to capture and confiscation; the decree of January 18, 1798, issued by the council of five hundred, condemned neutral vessels carrying *355 any British merchandise, and March 2, 1797, came into force the requirement of the crew list or “ róle équipage,” which* will be more fully considered hereafter. (Doc. 102, p. 160.)
President Washington, in 1793 (message December 5), spoke-of the vexations and spoliations understood to have been committed on our vessels and commerce by the cruisers and officers* of some of the belligerent powers as requiring attention, and suggested that, on receipt of proofs, “ due measures would be taken to obtain redress of the past and more effectual provisions against the futurewhereupon proof began immediately to be furnished.
Before this, the Secretary of State, then Mr. Jefferson, hadi advertised to the world assurances of governmental protection and .aid.
“ I have it in charge from the President [he said in his circular of August 27, 1793,] to assure the merchants of the United States concerned in foreign commerce or navigation that our attention will be paid to any injuries they may suffer on the high seas or in foreign countries, contrary to the laws of nations and existing treaties, and that on their forwarding hither well authenticated evidence of the same, proper proceedings* will be adopted for their relief.”
Mr. Morris had already brought to the attention of the French minister of foreign affairs the obnoxious acts of the late assembly,” but without securing redress, as the 11 attention of the Government was too strongly directed towards itself” to think of exterior interests, “ and the assembly, at open war with the executive, would certainly reject whatever should now be presented to them.” (Doc. 102, p. 31.)
Meantime our relations with Great Britain had* become extremely threatening, various questions growing out of the revolution still remained unadjusted, and when the instructions given by the admiralty, June 8, 1793, became known in the United States it was felt that decisive action could not be longer delayed. These instructions directed the commanders of His Majesty’s ships of war and privateers to seize all vessels loaded with corn, flour, or meal bound to any port in France, or to any port occupied bv French armies, and to send the vessels thus seized into any convenient harbor that the cargo might be purchased by the British Government and the ships released-*; also to seize all ships, whatever their cargo, bound to a blockaded port; also to warn off under penalty of seizure *356 any vessel destined'to a port not actually blockaded, but “declared” to be blockaded. (Foreign Eelations, vol. 1, p. 240.)
. Great Britain, when complaint was made of these orders, attempted to. justify them upon the insufficient plea that provisions were contraband of war. (Foreign Relations, vol. 1, pp. 240,448, et seq.) Correspondence leading to no prospect of a satisfactory result, the President nominated Mr. Jay as minister, saying to the Senate (April 16, 1794), that “ as peace ought to be pursued with unremitted zeal before the last resource, which has so often been the scourge of nations, and cannot fail to check the advanced prosperity of the United States, is contemplated,” he had concluded to take this action, (id., 447.) The instructions given Mr. Jay are not of importance in this connection, as it is sufficient to. note the result of his negotiation in the treaty which bears his name, and to compare its important provisions with our agreement made in 1778 with the King of France.
We had promised France that their ships of war and privateers might freely carry whithersoever they pleased the ships and goods taken from their enemies; that these prizes should not be arrested or seized, or examined, or searched in our ports, but might at any time freely leave, while no shelter or refuge was to be given to vessels having made prize of her “ subjects, people, or property.” (Art. 17, Treaty of Commerce, 1778.) The United States had thus given France, and for consideration, not only a valuable, but an exclusive right j yet the Jay treaty, in the twenty-fifth article, gave these same privileges to Great Britain, excluding all vessels which “ should have made prize upon [her] subjects.”
The conflict of the treaties is evident and of course was fully appreciated at the time.
While the Jay treaty was concluded in November, 1794, its ratifications were not exchanged until October the following year, and meantime the British orders in council directing seizure of our vessels and provisions bound to France were so enforced as to call forth from Mr. Randolph, then Secretary of State, the warning, as late as July, 1795, that the Jay treaty had not yet been ratified by the President j “ the late British order in council for seizing provisions is a weighty obstacle to ratification. I do not suppose that such an attempt to starve France will be countenanced.” (Foreign Eelations, vol. 1, p. *357 719.) Every endeavor was made by the United States to secure a repeal of the admiralty order, but without success, and finally onr minister in London, Mr. Adams, was instructed that if, after every prudent effort, he found it could not be removed, its continuance was not to be an obstacle to the exchange of ratifications. The order was not removed or modified; nevertheless ratifications of the treaty were exchange the following October.
It should here be noted that soon after the exchange a commission was organized which, among other subjects, was to ascertain the amount of the claims of American citizens on Great Britain for captures made in violation of international law. After various interruptions the labors of this tribunal closed in February, 1804, when awards considerably exceeding a million and a quarter pounds sterling had been made in favor of the United States on account of these claims. (Treaties and Conventions, Bancroft Davis, 1014-1016.) This commission existed by virtue of the sixth and seventh articles of the Jay treaty, the latter of which provided that whereas complaints had been made by citizens of the United States that during the course of the war “in which His Majesty is now engaged they have sustained considerable losses and damage by reason of irregular or illegal captures or condemnations of their vessels and other property under color of authority or commissions from His Majesty,” it was agreed that where adequate compensation could not then be actually obtained in the ordinary course of justice full compensation would be made by the British Government.
Note further that these claims were for spoliations committed by England to starve the French, as the claims now before us are for spoliations committed by France to feed her people, and, again, remember, by way of explanation, that the remedy alluded to in the Jay treaty, as being perhaps obtainable in due course of justice, was a possible recovery by the captured vessel in an action against the privateer upon his bond.
Mr. Morris, proving unacceptable to the French Government, was recalled at their request, and succeeded by Mr. Monroe, who endeavored to secure from his colleague, Mr. Jay, information as to the latter’s negotiation, which was refused, as Moiiroe declined to pledge himself not to communicate it to the French Government. (Foreign Relations, vol. 1, pp. 517, 700.) *358 France was restive under the situation, and, shortly after the ■ratification of the treaty, asked whether the President had •caused orders to be given to prevent the sale of prizes con.- ■ ducted into the ports of the United States by vessels of the Republic or privateers armed under its authority. As to this •question the Secretary of State informed the President:
“That the twenty-fifth article of the British treaty having •explicitly forbidden the arming of [French] privateers, and the selling of their prizes in the ports of the United States, the Secretary of the Treasury prepared, as a matter of course, circular letters to the collectors to conform to the restriction contained in that [article of the British treaty | as the law of the Hand. This was the more necessary, as formerly the collectors were instructed to admit to an entry and sale the prizes brought into our ports by the French.”
The Secretary also wrote our minister in London that orders had been given to prevent the sale of prizes brought into United •States ports by French privateers, “comformably with the twenty-fifth article” of the Jay treaty. So we had finally and -openly transferred any exclusive rights of France under the treaty of commerce to her bitter enemy, Great Britain.
But we had another obligation towards our former ally, that •of guaranteeing her West India Islands.
Long prior to this (December 11, 1787) Jefferson, while in Paris, had told the British minister there, during a discussion as to the effect of the treaties of 1778, in case of war between France and Great Britain, and told him “frankly and without hesitation,” that the dispositions of the United States would then be neutral, and that this would be to the interest of both powers, because it would relieve both from all anxiety as to feeding their West India Islands; that England, too, by suffering us to remain so, would avoid a heavy land war on .our •continent, which might very much cripple her proceedings ■elsewhere; that our treaty [with France] indeed obliged us to receive into our ports the armed vessels of France, with their prizes, and to refuse admission to the prizes made-on her by her enemies; that there was a clause, also, by which we guaranteed to France her American possessions, and which might perhaps force us into the war if these were attacked. “Then it will be war,” said the minister, “ for they will assuredly be attacked.”
In 1780 another American minister informed the English *359 secretary of state for foreign affairs “that in a war between Great Britain and tlie House of Bourbon (a thing which, must happen at some time) we [the United States] can give the West India Islands to whom we please, without engaging in the war ourselves, and our conduct must be governed by our interest” (Waite’s American State Papers, vol. 10, p. 97); and this in face of a treaty concluded but twelve years before wherein we pledged ourselves to a guarantee “ forever” of the possessions in America of that very House of Bourbon. Early in 1794 Mr. .Jefferson, then Secretary of State, said, as to this subject, that he had no doubt we should interpose at the proper time “and •declare both to England and France thar these islands are to rest with France, and that we will make a common cause with the latter for that object.” (Jefferson to Madison, April 3,1794, Jefferson’s Works, vol. 4, p. 103.)
The understanding, therefore, seems to have been clear, yet the West India Islands went to England.
The French spoliations began heedlessly through the mistaken action of subordinates, who confounded Americans with English, because of the identity of race and language. In October, 1793, Mr. Deforgues wrote to Mr. Morris:
“We hope that the Government of the United States will attribute to their true cause the abuses of which you complain, as well as other violations of which our cruisers may render themselves guilty íd the course of the present war. It must perceive how difficult it is to contain within just limits the indignation of our marines, and, in general, of all the French patriots, against a people speaking- the same language and having the same habits as the free Americans. The difficulty of distinguishing our allies from our enemies has often been the cause of offenses committed on board your vessels. All that the administration can do is to order indemnification to those who have suffered and to punish the guilty.” (Doc. 102, p. 70.)
Not long, however, could this plaintive response suffice as an excuse for the outrages committed upon our citizens and their property, for, as we have seen by the decrees already cited (and there were many more), the assembly soon joined in the attack, authorized it, and rendered it governmental.
A single mistaken capture might be forgiven, provided proper compensation were made for injury to the citizen; but, when wholesale seizures were directed by the legislature and there *360 upon made by the executive, tbe matter assumed a much more-serious and difficult aspect. To use the words of Mr. Sumner r
“ As intelligence of these spoliations reached the United States our whole commerce was fluttered. Merchants hesitated to expose ships and cargoes to such cruel hazards, and thereupon appeared the circular letter of the Secretary of State and the President’s proclamation encouraging, by the promise of protection, those injured by the spoliators.”
So ended the first phase of this controversy with a nation to whom we were bound by the strongest treaty ties, a nation engaged in war against an apparently overwhelming force and whose enemies used means of attack openly admitted to be contrary to the laws of civilized warfare; in alleged self-defense,, it pursued an equally if not more indefensible course, which resulted in severe and unjustifiable loss to our citizens. That this system of seizures or spoliations was forbidden by every principle of civilized warfare was frankly admitted at the time, and later, England, which had pursued a similar course, made ample amends, and Spain, which had countenanced the policy of France, and lent her ports in aid of it, did the same.
Nor were we altogether clear of blame. We had not complied, so far as appears, with the stipulations of the treaties of 1778, intended to provide for possible war; we had not protected the West India Islands, and not only had we refrained from acting as the ally of France, but, by the Jay treaty, we had given to her enemy the exclusive port privileges which she most valued, and which were secured to her by the treaty of amity and commerce.
It is not for us to criticise the patriotism and wisdom of the American statesmen of that day, the leading figures of our history, the men who bore the brunt of the fight which brought-thirteen struggling colonies through a war with one of the-mightiest and bravest nations of Europe to the successful issue . which made possible the United States of to-day, with their-thirty-eight States, eight Territories, and population of not far from sixty millions. Responsible for the welfare and future of a little republic of some two and a half millions of inhabitants,, exhausted by seven years’ warfare, and environed on this continent by the three great monarchies of Europe; their country poor in finance, weak in population, and an object of jealousy and distrust to every sovereign, these eminent men dealt in a- *361 spirit of enlightened patriotism and high courage with the political questions presented to them, according to their best and well-trained judgment, in the light of the information they then had. We now, as a judicial body, treat the facts as they are presented in relation to private rights, and no judgment of ours can properly be held, as it has been argued it would be, to reflect in any manner upon the course pursued by the President, : his advisers and subordinates, in the anxious period between 1789 and 1800. Upon their diplomatic foresight and ability no decision of ours can cast a shadow, and it must be clearly understood that we deal only with those private rights which may possibly have been invaded in the pursuit of a policy aiming at the life and prosperity of the nation.
The French complained of our course during the war then progressing, while we complained of spoliation and maltreatment of our vessels at sea, losses by the embargo at Bordeaux, non-payment of drafts drawn by the Colonial administration, seizures of cargoes of vessels, non-performance of contracts by Government agents, condemnation of vessels and their cargoes in violation of the treaties of 1778, and captures underthe decree of 1793. (Foreign Relations, vol. 1, p. 748 ei seq.)
Pinckney was ordered out to replace Monroe under particular instructions to “look into” the claims of our citizens (ib., 742), but before he arrived the decree of October 31, 1796, was made public, which prohibited the importation of manufactured articles, whether of English make or English commerce (6 Garden, 117), and Pinckney upon his arrival was not recognized or received, but ordered to leave France, as that Government would receive no minister from the United States “ until after a reparation of the grievances demanded of the American Government, and which the French Republic had a right to expect.” (Foreign Relations, vol. 1, p. 746.)
The strained relations between the two countries cannot be better illustrated than by an extract from the speech of the president of the Directory made to Monroe, in the presence of the diplomatic corps, when the latter, on the 30th December, 1796, took his official leave. Upon that occasion the president said:
“ By presenting this day to the Executive Directory your letters of recall you offer a very strange spectacle to Europe. Erance, rich in her freedom, surrounded by the train of her *362 victories, and strong in the esteem of her allies, will not stoop to calculate the consequences of the condescension of the American Government to its ancient tyrants. The Freuch Republic expects, however, that the successors of Columbus, Raleigh, and Penn, always proud of their liberty, will never forget that they owe it to France. They will weigh in their wisdom the magnanimous friendship of the French people with-the crafty caresses of perfidious men who meditate to bring them again under their former yoke. Assure the good people of America, Mr. Minister, that, like them, we adore liberty; that they will always possess our esteem, and find in the French people that republican generosity which knows how to graut peace as well as to cause its sovereignty to be respected.” (Foreign Relations, vol. 1, p. 747.)
This speech, as President Adams said, discloses sentiments — ■
“More alarming than the refusal of a minister, because more dangerous to our independence and union, and at the same time studiously marked with indignities towards the Government of the United States. It evinces a disposition to separate the people of the United States from the Government. * * * Such attempts ought to be repelled with a decision which shall convince France and the world that we are not a degraded people, humiliated under a colonial spirit of fear and sense of inferiority, fitted to be the miserable instruments of foreign influence, and regardless of national honor, character, and interest.” (Foreign Relations, p. 40.)
The President added that, having no diplomatic representative in France, he had no means of obtaining official information, but believing that a decree had been passed contravening in part the commercial treaty of 1778, he laid a copy of that instrument before the Congress, stating that it was his “ indispensable duty to recommend to [their] consideration effectual measures of defense.” The Congress were, however, peacefully inclined, although before adjourning they passed the law providing passports for American vessels. (1 Stat. L., 489.)
Soon after the adjournment (June 22) Pinckney, Marshall, _ and Gerry were commissioned envoys to France for the purpose of endeavoring to renew relations with that country.
Jefferson, then Vice-President, immediately wrote Gerry:
“ That peace is undoubtedly at present the first object of our nation. Interest and honor are also national considerations. But interest, duly weighed, is in favor of peace, even at the expense of .spoliations, past and future, and honor cannot now be an object. The insults and injuries committed on us by both the belligerent parties from the beginning of 1798 to this *363 day, and still continuing, cannot be wiped off by engaging in war with, one of them. Our countrymen have divided themselves by such strong affections to the French and the English that nothing will secure us internally but a divorce from both nations.” (Jefferson’s Works, vol. 4, p. 187.)
The tone and intent of the instructions to these envoys may be understood from one paragraph in Mr. Pickering’s letter to them (Doc. 102, p. 464, July 15, 1797):
“ Finally, the great object of the Government being to do jus-ticeto France and her citizens, if in anything we have injured them, to obtain justice for the multiplied injuries they have committed against us, and to preserve peace, your style and manner of proceeding will be such as shall most directly tend to secure these objects.”
The envoys had hardly reached Paris when another decree was aimed against our suffering merchants which prohibited every vessel that had entered an English port from being admitted into any pore of the French Bepublic, and handed over to condemnation every vessel laden in whole or in part with merchandise coming out of England or her possessions. (Doc. 102, p. 483.) The American ministers protested, saying that the decree attacked the interests and independence of neutral powers ; that it took from them the profits of an honest and lawful industry, as well as the inestimable privilege of conducting their own affairs as their judgment might direct, and added that acquiescence in it would establish a precedent for national degradation which would authorize any measures power might be disposed to practice. (Ib., 483, et seq.)
France leaned to dictation, not negotiation. With Bonaparte successful in Italy and Talleyrand at the head of foreign affairs, she was in a far from conciliatory temper. The result was that, without ever being received officially, the envoys returned, not, however, before Talleyrand had, as a set-off to their demands, presented the counter-claims of France. (Foreign Bela-tions, vol. 2, p. 190.)
During this mission occurred the notorious X. Y. Z. episode, when demands were made upon the ministers by individuals, veiled in the dispatches under these mysterious letters, for a large sum of money as a douceur to the Directory and an additional and much larger amount as a loan to France. Talleyrand later, and over his own signature, proposed a loan, omitting reference to the douceur, and in the same note complained *364 of the Jay treaty as a principal grievance. The dispatches containing a,n account of the N. Y. Z. episode coming back from the United States in print, Gerry, the only envoy then remaining, left Paris on the 26th July, 1798. (Treaties and Conventions, Bancroft Davis, 997, 998.)
The return of the mission created an effect at home very inimical to France; the President said he would never send another minister without assurances that he would be received, respected, and honored as “ the representative of a great, free, powerful, aud independent nation ” (Foreign Relations, vol. 2, p. 199) ; but before this (June 21,1798), Congress had passed the act “ to more effectually protect the commerce and coasts of the United States” (May 28, 1798, 1 Stat. L., 561), thé act suspending commercial relations with France (June 13, 1798), and various other laws of similar import, which will be considered hereafter in connection with another branch of this case.
Washington was put in command of the army as.lieutenant-general and commander4n-chief, and in accepting said (5 Annals of Cong., 622):
“ The conduct of the Directory of France towards our country ; their insidious hostility to its Government; their various practices to withdraw the affections of the people from it; the evident tendency of their acts and those of their agents to countenance apd invigorate opposition; their disregard of solemn treaties and the law of nations; their war upon our defenseless commerce; their treatment of our ministers of peace; and their demands, amounting to tribute, could not fail to excite in me corresponding sentiments with those my countrymen have so generally expressed.”
This state of affairs could not long continue. Talleyrand, appreciating the dangers of the situation, soon opened indirect communication with the United States, and on the 28th September, said that our plenipotentiary if sent would be “received with the respect due to the representative of a free, independent, and powerful nation. (Foreign Relations, vol. 2, p. 242.) This was an exact compliance with the President’s condition precedent, and thereupon Oliver Ellsworth, Chief Justice of the United States, William R. Davie, late governor of North Carolina (Patrick Henry declining to serve), and William Vans Murray, minister resident at The Hague, were commissioned envoys extraordinary and ministers plenipotentiary “ to discuss *365 and settle by a treaty all controversies between the United States and France.” (Ib., 243.) This mission, appointed in March, 1799, closed its labors by the treaty signed September 30, 1800.
Arriving in France they found the Directory no longer in existence, but treated with Napoleon, then become First Consul. Ministers were appointed to meet them, and the 7th April, 1800, powers were exchanged and negotiations began. (Doc. 102, p. 579.)
The Americans were instructed to inform the French ministers at the opening that we expected, “as an indispensable condition of the treaty,” a stipulation to make to our citizens “ full compensation for all losses and damage which they shall have sustained by reason of irregular or illegal captures or. condemnations of their vessels and other property, under color of authority or commissions from the French Eepublic or its agents.” Other points wrere urged upon them, but for the purpose of this case it is necessary only to note that they were to obtain a claims commission, to refuse recognition of the treaties of 1778, to refuse a guarantee, to refuse any aid or loan, and to make no engagement contrary to the Jay treaty. (Foreign Eelations, vol. 2, p. 306.)
The Secretary of State said, in his instructions:
“Instead of relief, instead of justice, instead of indemnity for past wrongs, our very moderate demands have been immediately followed by new aggressions and more extended depredations, while our ministers, seeking redress and reconciliation, have been refused a reception, treated with indignities, and finally driven from its territories. This conduct * * * would well have justified an immediate declaration of war, but * * * the United States contented themselves with preparations for defense, and measures calculated to protect their commerce.”
At the close of his instructions the Secretary sets out certain points to be considered as ultimata, of which the following only is now important:
“ 1. That there be established a board to determine the claims i of our citizens, which France should bind herself to pay.”
Having carried the history of the claims down to this point let us look back upon it and see what rights we had at that time as against France, laying aside for the moment certain defenses set up by the defendants, such as the existence of war *366 and the abrogation of the old treaties. Apart from these points, which have been urged upon us with great ability by the learned counsel for the Government, were the claims at the opening of the negotiations in 1800 valid international obligations against France?
That nation had seized upon the high seas neutral vessels laden with neutral cargo. In the case at bar, for example, the American schooner Sally, owned by citizens of the United States, commanded by a citizen of the United States, duly registered under the laws of the United States, bound from Massachusetts to Spain, laden with cargo belonging to American citizens, was seized upon the high seas, taken into a French port, condemned and confiscated for the benefit of the privateer which seized her; and all this, not upon the ground that she had violated the law of nations, but because she had violated the French regulations “concerning the navigation of neutrals.” It seems hardly necessary to discuss the proposition that such a proceeding was unwarranted; the French themselves admitted it in their decrees and correspondence; the Kussian Ozar, in ordering his admiral to pursue a similar course, said it was not “ strictly conformable to the natural laws of war.” England paid for damages thus committed, as did Spain, which had countenanced the acts of French consuls in condemning American vessels brought into Spanish ports. (Treaty of 1819.)
Senator Livingston, in the Twenty-first Congress, first session, said, in the report made by him:
“The committee does not recollect that the justice of the claims has ever been denied. * * * To deny [it] would be assertion of a right on the part of France to indiscriminate plunder of neutral property. * * * But the justice of the claims was not denied, and the necessity of providing indemnity was expressly acknowledged.”'
This is true as a matter of pure international law; how much more true is it in the face of a treaty which guaranteed the protection to our vessels (Art. 6) of French ships of war; which made free ships free goods (Art. 23); which prohibited opening hatches or disturbing packages when the vessel had a passport (Arts. 12 and 13); which directed the commanders of. French ships to do no “injury or damage” to vessels of the United States (Art. 15), and which contained other provisions *367 insuring an exceptional amount of protection to our commerce and guardianship of our commercial rights'?
Mr. Jefferson thought this class of claims valid when he issued his circular of August, 1793, assuring the mercantile community that due attention would be paid to these injuries and proper proceedings adopted for their relief. The President thought them valid when, later in the same year, he wrote to Congress that due measures would be taken to “obtain redress of the past and more effective provisions against the future.” Pickering thought them valid when he made their settlement an ultimatum, and the French Government thought them worthy of consideration when they proposed a commission to decide upon them coupled with the counter proposition that the United States indemnify American creditors then existing, or to be created through the agency of this commission, by way of a loan to France, which that country was to be pledged to repay. (Doc. 102, p. 467.)
The defendants contend that the seizures were justified, as war existed between this country and France during the period in question; and, as we could have no claim against France for seizure of private property in time of war, the claimants could have no resulting claim against their own Government; that is, the claims, being invalid, could not form a subject of set-off as it is urged these claims did in the second article of the treaty of 1800. It therefore becomes of great importance to determine whether there was a state of war between the two countries.
It is urged that the political and judicial departments of each Government recognized the other as an enemy; that battles were fought and blood shed on the high seas; that property was captured by each from the other and condemned as prize; that diplomatic and consular intercourse was suspended, and that prisoners had been taken by each Government from the other and “held for exchange, punishment, or retaliation, according to the laws and usages of war.” While these statements ma^ be in substance admitted and constitute very strong evidence of the existence of war, still they are not conclusive, and the facts, even if they existed to the extent claimed, may not be inconsistent with a state of reprisals straining the relations of the States to their utmost tension, daily threatening hostilities of a more serious nature, but still short of that war *368 which abrogates treaties, and after the conclusion of which the parties must, as between themselves, begin international life anew.
The French issued decree after decree against our peaceful commerce, but on the ground of military necessity incident to the war with Great Britain and her allies; they refused to receive our minister, but in that refusal, insolent though it was, there is nothing to show that war was intended, and the mere refusal to receive a minister does not in itself constitute a ground for hostilities.
The Attorney-General, Mr. Lee, in August, 1798, very strongly sustained the defendants’ position, for he wrote the Secretary of State that there existed with France “not only an actual maritime war,” but “ a maritime war authorized by both nations;” that consequently France was an enemy, to aid and assist .whom would be treason on the part of a citizen of the United States; but we cannot agree that this extreme position was- authorized by the facts or the law.
Congress enacted the various statutes hereinafter referred to in detail, and when one of them, the act providing an additional armament, was passed in the House, Edward Livingston, who opposed it, said:
“Let no man flatter himself that the vote which has been given is not a declaration of war. Gentlemen know that this is the case.”
Those were times of great excitement; between danger of international contest and the heat of internal partisan conflict statesmen could not look at the situation with the calmness possessed by their successors, and those successors, with some exceptions to be sure, regarded the relations between the countries as not amounting to war.
The question has been carefully examined by authorized and competent officers of the political department of the Government, and we may turn to their statements as expository of the views of that branch upon the subject.
In 1827 Senator Holmes reported that there had been “ a partial war,” but no “ such actual open war as would'absolve us from treaty stipulations. * * * It was never understood here that this was such a war as would annul a treaty.” (19th Gong., 2d sess., Senate Hep., Feb. 8, 1827, p. 8.)
' Mr. Giles, reporting to the House of Eepresentatives as early *369 as 1802, called it a “ partial state of hostility ” between the United States and France.
Mr. Chambers reported to the Senate in 1828 that—
“ The relations which existed between the two nations in the interval between the passage of the several acts of Congress before referred to and the convention of 1800 were very peculiar, but in the opinion of your committee cannot be considered as placing the two nations in the attitude of a war which would destroy the obligations of previously existing treaties.”
Mr. Livingston reported to the Senate in 1830 that—
“ This was not a case of war, and the stipulations which reconciled the two nations was not a treaty of peace $ it was a convention for the putting an end to certain differences. * * * Nowhere is the slightest expression on either side that a state of war existed, which would exonerate either party from the obligations of making those indemnities to the other. * * * The convention which was the result of these negotiations is not only in its form different from a treaty of peace, but it contains stipulations which would be disgraceful to our country on the supposition that it terminated a state of war. * * * Neither party considered then they were in a state of war.” (Rep. 4, p. 445.)
Mr. Everett made a statement in the House of Representatives on the 21st February, 1835, in which he said :
“ The extreme violence of the measures of the French Government and the accumulated injuries heaped upon-our citizens would have amply justified the Government of the United States in a recourse to war; but peaceful remedies and measures of defense were preferred; [and, after referring to the acts of Congress, he adds:] These vigorous acts of defense and preparation, evincing that, if necessary, the United States were determined to proceed still further and go to war for the protection of their citizen^ had the happy effect of precluding a resort to that extreme measure of redress.” '
Finally, Mr. Sumner considered the acts of Congress as “ vigorous measures,” putting the country “ in an attitude of defense;” and that the “painful condition of things, though naturally causing great anxiety, did not constitute war.” (38th Cong., 1st sess., Rep. 41, 1864.)
The judiciary also had occasion to consider the situation, and the learned counsel for defendants cites us to the opinion of Mr. Justice Moore delivered in the case of Bass v. Tingy (4 Dall., 37), wherein the facts were as follows: Tingy, commander of the public armed ship the Ganges, had libeled the *370 American ship Eliza, Bass master, setting forth that she had been taken on the high seas by a French privateer the 31st March, 1799, and retaken by him late in the following April, wherefore salvage was claimed and allowed below. Upon appeal the judgment was affirmed. Each of the four justices present delivered an opinion.
Justice Moore, answering the contention that the word “ enemy ” could not be applied to the French, says:
“ How can the character of the parties engaged in hostility or war be otherwise described than by the denomination of enemies ? It is for the honor and dignity of both nations, therefore, they should be called enemies; for it is by that description alone that either could justify or excuse the scene of bloodshed, depredation, and confiscation which has unhappily occurred, and surely Congress could only employ the language of the act of June 13, 1798, towards a nation whom she considered as an enemy.”
Justice Washington considers the very point now in dispute, saying (p. 40):
“The decision of the question must depend upon * * * whether at the time of passing the act of Congress of the 2d of March, 1799, there subsisted a state of war between two nations. It may, I believe, be safely laid down that every contention by force between two nations, in external matters, under the authority of their respective Governments, is not only war, bub public war. If it be decreed in form it is called solemn and. is of the perfect kind, because one whole nation is at war with another whole nation, and all the members of the nation declaring war are authorized to commit hostilities against the members of the other in every place and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition. But hostilities may subsist between two nations more confined'in its nature and 'extent, being limited as to places, persons, and things, and this is more properly termed imperfect war, because not solemn, and because those who are. authorized to commit hostilities act under special authority and can go no further than to the extent of their commission. Still, however, it is public war, because it is an external contention by force between some of the members of the two nations, authorized by the legitimate powers. It is a waf between the two nations, though all the members are not authorized to commit hostilities such as in a solemn war where the Government retains the general power.”
Applying this rule he held that “ an American and French armed vessel, combating on the high seas, were enemies,” but *371 added that France was not styled “an enemy” in the statutes, because “ the degree of hostility meant to be carried oil was sufficiently described without declaring war, or declaring that we were at war. Such a declaration by Congress might have •constituted a perfect state of war which was not intended by the Government.” i
Justice Chase, who had tried the case below, said:
“ ft is a limited, partial war. Congress has not declared war in general terms, but Congress has authorized hostilities on the high seas by certain persons in certain cases. There is no authority given to commit hostilities on land, to capture unarmed French vessels, nor even to capture French armed vessels in a French port, and the authority is not given indiscriminately to every citizen of America against every citizen of France, but ■only to citizens apppointed by commissions or exposed to immediate outrage and violence. * * * If Congress had chosen to declare a general war, France would have been a general enemy; having chosen to wage a partial war, France was * * * only a partial enemy.”
Justice Patterson concurred, holding that the United States and France were “in a qualified state of hostility” — war “ qitoad hoe.” As far as Congress tolerated and authorized it, so far might we proceed in hostile operations and the word “ enemy” proceeds the full length of this qualified war, and no further.
The Supreme Court, therefore, held the state of affairs now under discussion to constitute partial warfare, limited by the acts of Congress.
The instructions to Ellsworth, Davie, and Murray, dated October 22, 1799, did not recognize a state of war as existing, •or as having existed, for they said the conduct of France would have justified an immediate declaration of war, but the United •States, desirous of maintaining peace, contented themselves •“ with preparations for defense and measures calculated to defend their commerce.” (Doc. 102, p. ¿561.) Yet all the measures relied upon as evidence of existing war had taken effect prior to the date of these instructions. So the ministers, in a communication to the French authorities, said, as to the acts of Congress, “ which the hard alternative of abandoning their commerce to ruin imposed,” that “ far from contemplating a co-operation with the enemies of the Eepublic [they] did not even authorize reprisals upon her merchantmen, but were re *372 stricted simply to the giving of safety to their own, till a. moment should arrive when their sufferings could be heard and redressed.” (Doc. 102, p. 583.)
France did not consider that war existed, for her minister-said that the suspensions of his functions was not to be regarded as a rupture between the countries, “ but as a mark of just discontent” (15 Nov., 1796, Foreign Relations, vol. 1, p. 583), while J. Bonaparte and his colleagues termed it a “transient misunderstanding” (Doc. 102, p. 590), a state of “misunderstanding” which had existed “ through the acts of some agents rather than by the will of the respective 4 Governments,’” and which had not been a state of war, at least on the side of France. (Ib., 616.)
The opinion of Congress at the time is best gleaned from the-laws which it passed. The important statute in this connection is that of May 28, 1798 (1 Stat. L., 561), entitled “Án act more effectually to protect the commerce and coasts of the United States.” Certainly there was nothing aggressive or warlike in this title.
The act recites that, whereas French armed vessels have committed depredations on American commerce in violation of the law of nations and treaties between the United States and France, the President is authorized — not to declare war, but to direct naval commanders to bring into our ports, to be proceeded against according to the law of nations, any such vessels “which shall have committed, or which shall be found hovering on the coasts of the United States for the purpose of committing, depredations on the vessels belonging to the citizens thereof; and.also to retake any ship or vessel of any citizen or citizens of the United States which may have been captured by any such armed vessel.”
i his law contains no declaration or threat of war; it is distinctly an act to protect our coasts and commerce. It says that our vessels may arrest a vessel raiding or intending to raid upon that commerce, and that such vessel shall not be either held by executive authority or confiscated, but turned, over to the admiralty courts — recognized international tribunals — for trial, not according to muuicii>al statutes, as was-being done in France, but according to the law of nations. Such a statute hardly seems necessary, for if it extended at all the police powers of naval commanders upon the high seas it *373 was in tlie very slightest degree, and it is highly improbable that then or now, with or without specific statutory or other authority, an American naval commander would in fact allow a vessel rightfully flying the flag of the United States to be seized on the high seas or near our coasts by the cruiser of another Government. But if the act did enlarge the power of such officers, and 'give to them authority not theretofore possessed, it tied them down to specified action in regard to specified vessels.
They might seize armed vessels only, and only those armed vessels which had already committed depredations, or those which were on our coast for the purpose of committing depredations, and they might retake an American vessel captured by such an armed vessel. This statute is a fair illustration of the class of laws enacted at -this.time; they directed suspension of commercial relations until the end of the next session of Congress, not indefinitely (June 13, 179¿, ib., § 4, p. 566) •, they gave power to the President to' apprehend the subjects of hostile nations whenever he should make “ public proclamation” of war (July 6, 1798, ib., 577;, and no such proclamation was made; they gave him authority to instruct our armed vessels to seize French “armed,” not merchant, vessels (July 9, 1798, ib., 578), together with contingent authority to augment the army in case war should break out or in case of imminent danger of invasion. (March 2, 1799, ib., 725.) Within a few months after this last act of Congress the Ellsworth mission was on its way to France to begin the negotiations which resulted in the treaty of 1800 and even the act abrogating the treaties of 1778 does not siieak of war as existing, but of “ the system of predatory violence # * * hostile to the rights of a free and independent nation.” (July 7, 1798, ib., 578.)
If war existed why authorize our armed vessels to seize French armed vessels? War itself gave that right, as well as the right to seize merchantmen, which the statutes did not permit. If war existed vliy empower the President to apprehend foreign enemies ? War itself placed that duty upon him as a necessary and inherent iuci&ent of military command. Why, if there was war, should a suspension of commercial; intercourse be authorized, for what more complete suspension of that intercourse could there be than the very fact of war? And why, if war did exist, should the President, so late as *374 March, 1799, be empowered to increase the army upon one of two conditions, viz, that war should break out or invasion be imminent, that is, if war should break out iu the future or invasion become imminent in the future ?
Upon these acts of Congress alone it seems difficult to found a state of war up to March, 1799, while in February, 1800, we find a statute suspending enlistments, unless, during the recess of Congress, “war should break out with France.” This-is proof positive that Congress, did not then consider war as existing, and in fact Ellsworth, Davie, and Murray were at the time hard at work iu Paris. In May following the President was instructed to suspend action under the act providing for military organization, although the treaty was not concluded until the following September.
This legislation shows that war was imminent; that protection of our commerce was ordered, but distinctly shows that, in the opinion of the legislature, war did not in fact exist.
Wheaton draws a distinction between two classes of war, j saying:
“ A perfect war is one Í other nation, and all the members of both nations are authorized ¡ to commit hostilities against all the members of the other, in ! every case, and under every circumstance permitted by the [ general laws of war. An imperfect war is limited as to places, j persons, and things [to which the editor adds:] Such were the I limited hostilities authorized by the United States against 1 France in 1798.” (Lawrence’s Wheaton, 518.)
There was no declaration of war; the tribunals of each country were open to the other — an impossibility were war in progress ; diplomatic and commercial inteicourse were admittedly suspended; but during many years there was no intercourse between England and Mexico, which were not at war,- ■ there was retaliation aud reprisal, but such retaliations and reprisals have often occurred between nations at peace; there was a near approach to war, but at no time was one of the nations turned into an enemy of the other in such manner that every citizen of the one becaine the enemy of every citizen of , the other; finally, there was not that kind of war which abro-i gated treaties and wiped out, at least temporarily, all pending- ! rights and contracts, individual and national.
3 In cases like this “ the judicial is bound to follow the action ( of the political department of the Government, and is concluded *375 by it” (Phillips v. Phillips, 92 U. S. R., 130); and we do not find an act of Congress or of the Executive between tbe years 1793 and 1801 which recognizes an existing state of solemn war, although we find statutory provisions authorizing a certain course “in the event of a declaration of war,” or “whenever there shall be a declared war,” or dining the existing “differences.” One act provides for an increase of the army “ in case war shall break out,” while another restrains this increase “unless war shall break out.” (1 Stat. L., 558, 577, 725, 750; ' see also acts of Feb. 10, 1800, and May 14, 1800.) . >
We have already referred to the instructions of the Executive, which show that branch of the Government in thorough accord with the legislative on this subject, and the negotiations of our representatives hereinafter referred to were marked by the same views, while the treaty itself — a treaty of amity and commerce of limited duration — is strong proof that what were called “ differences ” did not amount to war. We are, therefore, of opinion that no such war existed as operated to abrogate treaties, to suspend private rights, or to authorize indiscriminate seizures and condemnations; that, in short, there | was no public general war, but limited war in its nature simi- , lar to a prolonged series of reprisals.
The general effect and purpose of the treaty of 1800 can be clearly gleaned from the negotiations preceding its signature, which will next be considered.
The treaties of 1778 provided that French men-of-war should protect our vessels and citizens (Treaty of Commerce, Art. 6); that our merchantmen having passports and certificates showing their cargoes not to be contraband should not have their hatches opened, their packages disturbed, or the “ smallest parcels of goods ” removed (Arts. 12 and 13); that a French man-of-war meeting an American merchantman should remain out of cannon-shot, and send on board not more than three men, when, should the merchantman have a passport, he might proceed (Art. 27); freedom of trade was secured and contraband defined. . •
Soon after the French revolution the series of attacks upon our commerce began, at first veiled under the excuse of mistake, then of a necessary self-defense, coupled with promise of compensation, and finally open and undisguised. First it was said that the seizures were accidental, as the two English-speaking *376 nations could not be distinguished by the French sailors; soon after all neutral vessels laden with provisions and bound to an enemy’s port were ordered seized as a war measure, but compensation was promised ; and it was then that the President and Secretary of State, having already issued the proclamation of neutrality, which greatly incensed France, voluntarily promised protection and redress to citizens of the United States thus injured by our former ally. At this point, therefore, we have on both sides an admission of the validity of claims arising from the spoliations — the President, in the proclamation and circular letter, the French, in their decrees, as well as in a letter to the Secretary of State (March 27,1794), in which the French minister wrote that “ If any of your merchants have suffered any injury by the conduct of our privateers * * * they may with confidence address themselves to the French Government.” (Doc. 102, p. 264.) Nearly four months later the French commissioner of foreign relations informed our minister that there should not be a doubt of the disposition of the convention and Government to “ make good the losses which circumstances inseparable from a great revolution may have caused some American navigators to experience.” (July 5, 1794; ib., 77.) Then came Genet’s dismissal; Jay was sent to England, and Monroe, succeeding Morris, seemed to have progressed so successfully that Washington announced to Congress (Feb. 20, 1795) “that these claims are in a train of being discussed with candor, and amicably adjusted.” (Waite’s American State Papers, vol. 3, p. 402.)
The Jay treaty entirely changed the situation; France violently remonstrated, treated Monroe with insult, refused to receive Pinckney, threw off the last restraints upon its cruisers and privateers, and its colonial agents joined with so much vigor in the illegal attack upon a peaceful neutral commerce, that “ American vessels no longer entered the French ports unless carried in by force.” (Doc. 102, pp. 434, 435.)
Just complaint was not, however, confined to one side, for we had failed iu performance of obligations imposed upon us by the treaties of 1778. We had undertaken a guarantee of French possessions in America, and pledged ourselves that “in case of a rupture between France and England the reciprocal guarantee * * * shall have its full force and effect the moment such war shall break out.” (Art. 12, Treaty of Alii- *377 anee.) This guarantee was to endure “ forever.” It was contended by us that the casus feeder is could never occur except in a defensive war. As Secretary Pickering said:
“ The nature of this obligation is understood to be that when a war really and truly defensive exists the engaging nation is bound to furnish an effectual and adequate defense, in co-operation with the power attacked.” (.Doc. 102, p. 457, Pickering to Pinckney et ah, July 15, 1797.)
Whether the treaty so limited the obligation, or whether France in her struggle with the allied powers was waging a defensive war, is not now important. France certainly believed herself entitled to demand our aid, and understood the casus foederis to have occurred.
At theopening of the war France possessed the fertile islands of St. Domingo, Martinique, Guadaloupe, St. Lucia, St. Vincent, Tobago, Deseada, Mariegalaute, St. Pierre, Miquelon, and Granada, with a colony on the mainland at Cayenne, and “in little more than a month the French were entirely dispossessed of their West India possessions, with hardly any loss to the victorious nation.” (Alison’s History, vol. 3, p. 396.)
The French colonists urged us to intervene, but the French Government thought it wiser for us not then to embark in the war, as it might diminish their supplies from America; they would, however, they said, leave us to act according to our wishes, looking to us meantime for financial aid. (Foreign Relations, vol. 1, p. 688.) This was not a renunciation of the guarantee, nor was it so regarded here.
A study of the correspondence shows that these provisions of the two treaties, especially the guarantee, constantly hampered our ministers, and Jefferson said he had no doubt “ we should interpose at the proper time” (Jefferson’s Works, vol. 4, p. 102), while the French Government dwelt upon the “ in-execution of the treaties” (Foreign Relations, vol. 1, p. 658), said “they had much cause of complaint against us” (ib., 731), and finally refused to receive Pinckney “ until after a reparation of grievances,” while their minister here demanded “ in the name of American honor, in the name of the faith of the Treaties, the execution of that contract which assured to the United States their existence and which France regarded as the pledge of the most sacred union between two people the freest upon earth.” (Foreign Affairs, vol. 1, pp. 579 et seq.)
*378 The claims of France, national in their nature, were thus set up again against the claims of the United States, individual in their inception, but made national by their presentation through the diplomatic department of the Government.
It is not for us to say whether the claims of Prance had any validity in international law, because for the purpose of this case it-need only be observed that they were urged in diplomacy with every apparent belief that the French position was tenable. Whether valid or not théy were an efficient arm of defense against our contentions, and were so used with ability, skill, and success. In fact there is a recognition of apparent justness in these demands found in the instructions to the Pinckney mission, who were directed while urging our claims to propose a substitute for the mutual guarantee “or some modification of it,” as “instead of troops or ships of war” “to stipulate for a moderate sum of money or quantity of provisions,” tobe delivered in any future defensive war “not exceeding $200,000 a year during any such war” (Foreign Eolations, vol. 2, p. 155), and Talleyrand, on the other side, told Mr. Gerry (June 15) that the Eepublic desired to be restored to the rights which the treaties conferred upon it, and through these means to assure the rights of the United States. “You claim indemnities,” he said; we “equally demand them, and this disposition being as sincere on the part of the United States as it is on its [the Eepublic], will speedily remove all the difficulties.” (Doc. 102, p. 529.)
Such was the situation when the Ellsworth mission arrived in France..
The instructions to this legation directed them as an “indispensable condition” to obtain full compensation for all losses and damages sustained by citizens of the United States from irregular or illegal captures or condemnations.
The French representatives did not dispute the validity of the claims, but stood upon the treaties of 1778. To their opening propositions the American envoys received a courteous response, which, however, put a new phase upon the negotiation, and placed them in a most embarrassing position. Bonaparte and his colleagues said in substance (6 May, 1800, Doc. 102, p. 590): The discharge of damages between the two nations resulting from the “transient misunderstanding” can be “considered only as a consequence of the interpretation ” given by
*379 mutual consent to tbe treaties. They agreed “ upon tbe expediency of compensation,” and suggested that the discussion bad become confined to two points, tbe principle swhieh ought to govern tbe political and commercial relations of the two countries and tbe most suitable form for liquidating and discharging the indemnities due. The examination of principles should come first in order, they said, for “indemnification can only result from an avowed violation of an acknowledged obligation,” and an “agreement upon principles can alone assure peace and maintain friendship.” The French ministers then, alluding to the treaties, referred to the second article of the draft submitted by the Americans, which provided that the commission suggested should decide claims “conformably to justice and tbe law of nations, and in all cases of complaint prior to the 7th of July, 1798, they should pronounce agreeably to,the treaties and consular convention then existing between France and the United States.” Now this second article of the draft applied only to claims of. citizens of each country, while July 7, 1798, was the date of the act of Congress annulling the treaties; but the French ministers ignoring this said that they saw no reasons for the distinction, as .the treaties and convention are “the only foundations of the negotiations; ” that from them arose the misunderstanding, and upon them “union and friendship should be established;” and they thus significantly concluded: “When the undersigned hastened to acknowledge the principle of compensation, it was in order to give an unequivocal evidence of the fidelity of the French Government to its ancient engagements, every pecuniary stipulation appearing to it expedient as a consequence of ancient treaties, and not as the preliminary of a new one.” So the French were,planted squarely on the treaties which the Americans were forbidden to consider as existing after July, 1798. Two days later our ministers explained their- position (ib., 592), and nine days later wrote to the Secretary of State (ib., 607) that their success was still doubtful, as the “French think it hard to indemnify for violating engagements unless they can thereby be restored to the benefits of them.” Soon followed a conference between the plenipotentiaries, when the negotiations were brought to a halt, as no further progress could be had until other “powers” or “instructions,” for the two words seem to *380 have beeii used synonymously, were received from the First Consul.
. The French ministers had frequently .mentioned the insuperable repugnance of their Government to surrender the claim to priority assured to it in the “commercial treaty of 1778,” urging:
■ “The equivalent alleged to be accorded by France for this stipulation, the meritorious ground on which they generally represented the treaty stood, denying strenuously the power of the American Government to annul the treaties by a simple legislative act; and always concluding that it was perfectly incompatible with the honor and dignity of France to assent to the extinction of a right in favor of an enemy, and as much so to appear 10 acquiesce in the establishment of that righfin favor of Great Britain, The priority with respect to the right of asylum for privateers and prizes was the only point in the old treaty on which they had anxiously insisted, and which they agreed could not be as well provided for by a new stipulation.” (Doc. 102, p. 608.)
The American envoys (July 23,1800), in answer to the French arguments, reducing to writing the substance of two conferences, said (Doc. 102, p. 612):
“As to the proposition of placing France, with respect to an asylum for privateers and prizes, upon the footing of equality with Great Britain, it was remarked that the right which had accrued to Great Britain in that respect was that of an asylum for her own privateers and prizes, to the exclusion of her enemies, wherefore it was physically impossible that her enemies should at the same time have a similar right. With regard to the observation that by the terms of the British treaty the rights of France were reserved, and therefore the rights of Great Britain existed with such limitation as would admit of both nations being placed on a footing which should be equal, it was observed by the envoys of the United States that the saving in the British treaty was only of the rights of France resulting from her then existing treaty, and that that treaty having ceased to exist, the saving necessarily ceased also, and the rights which before that event were only contingent immediately attached and became operative.”
Admission of the continuing force of the old treaties might involve admission of France’s national claims, and in any event would put her ministers into a most advantageous position, giving them as consideration, to be surrendered at their pleasure in the new negotiation, what would then be a vested,' existing, and acknowledged right to the guarantee, the alliance, *381 and the use of our ports. Placed iu this position, France would be without incentive to action ; she would start in the discussion of a new treaty with more surrendered to her at the outset than she had hoped to obtain at the conclusion, and all that she afterward gave up would be by way of generous concession. Whatever the law, whether the treaties were or were not abrogated by the act of Congress or the acts of parties, the American envoys were not permitted to admit the French contention, but were in duty bound to argue that the treaties were without continuing force. They followed this course, saying:
“A treaty being a mutual compact, a palpable violation of it fy one party did, by the law of nature and of nations, leave it optional with the other to renounce and declare the same to be no longer obligatory. * * * The remaining party must decide whether there had been such violation on the other part as to justify its renunciation. For a wrong decision it would doubtless be responsible to the injured party, and might give cause for war; but .even in such case, its act of public renunciation being an act within its competence would not be a void but a valid act, and' other nations whose rights might thereby be beneficially affected would so regard it.” (Doc. 102, p. 612.)
After further argument, they added that as it was the opinion of the French ministers that “ it did not comport with the honor of France” to admit the American contentions, and at the same time be called upon for compensation, they offered “as their last effort” a proposition which suspended payment of compensation for spoliations “ until France could be put into complete possession of the privileges she contended for, and at the same time they offered to give that security which a great pecuniary pledge would amount to for her having the privilege as soon as it could be given with good faith, which might perhaps be in a Little more than two years; at any rate within seven.” (Ib., 613.)
The French answered (Doc. 102, p. 615) that they still found no reason to consider the treaties of 1778 as broken; the act of 1798, being that of one party, could not destroy, they said, “ otherwise than by war and victory,” that which was the engagement of two. After some further argument they wrote that they would not push further their observations, as—
“Those which they have repeated suffice to establish the rights of France, and to her the honor of a sacrifice which she *382 would make in renouncing the exclusive right of entry into the ports of America for French privateers accompanied with their prizes.” (Ib., 615.)
As to the proposal of a money indemnity for delay they said :
“The proposition of the American ministers offers to the Republic at a distant time the hope of exclusive advantages, and for the present, and, perhaps, for seven years, an humiliating forfeiture of those rights, and a shameful inferiority with regard to a state [Great Britain] over which she had acquired these privileges by the services she had rendered to America when it made war with such state. When the ministers of France can subscribe- to a condition unworthy the French nation, the price which they would put upon their humiliation would it not be the continuance of a subjection-, which they consider to be contrary to the interest of the United States t The dependence of her ally cannot be for her an indemnity for a national suffering. The French ministers believing it to be their duty to insist with their Government upon the immediate renunciation of a privilege well acquired, it would be contradictory that they should provide for its return at a distant time.” (Ib., 615, 616.)
Some two weeks later the French again insisted that the treaties were not broken by the state of “misunderstanding” which had existed “through the acts of some agents rather than by the will of the respective Governments,” and which had not been a state of war, at least on the side of France. (Ib., 616.) Yet, after this opening, the ministers use language in apparent antagonism with the position thus and before advanced that the treaties.were still existent; their tone toward the United States is marked by extreme bitterness, but they finish by consenting to an abolition of the treaties and the conclusion of a new one. The alternative proposition is thus put:
“Either the ancient treaties, with the privileges resulting from priority and the stipulation of reciprocal indemnities, or a new treaty, assuring equality without indemnity.” (Ib., 618.)
To the first of these proposals our ministers were forbidden to assent, as it involved an admission of the continuing, force Qf the treaties; to the second they could not assent, for their first duty was to obtain indemnity. The time had come when they must go beyond their instructions and assume personal responsibility. (Doc. 102, pp. 619, 620.)
In August, after some delay and apparent friction, the Amer *383 icans, saying that “ while nothing would be more grateful to America than to acquit herself of any just claims of France, nothing could be more vain than an attempt to discourse to her reasons for the rejection of her own,” made the following propositions (ib., 623-625):
“ (1) Let it be declared that the former treaties are renewed and confirmed and shall have the same effect as if no misunderstanding between the two powers had intervened, except so far as they are derogated from by the present treaty.
“ (2) It shall be optional with either party to pay to the other within seven years 3,000,000 of francs in money or securities which may be issued for indemnities, and thereby to reduce the rights of the other as to privateers and prizes to those of the most favored nation. And during the said term allowed for option the right of both parties shall be limited by the line of the most favored nation.”
The third proposition looked to such modification of the mutual guarantee that military stores should be furnished byr the one party to the value of 1,000,000 francs to the other when attacked, but either might within the seven years pay the lump sum of 5,000,000 francs to be freed from the obligation. The fifth proposition provided indemnities for individuals, and that “public ships taken on either side [should] be restored or paid for,” and the sixth that all' property seized byr either party and not yet “'definitively condemned” should be restored on reasonable proof of it belonging to the other. So they7 finally agreed to recognize the existence of the treaties, the right of France to the guarantee and exclusive port privileges, and.proposed to pay a lump sum to be free of their obligation in the future, for the propositions on this subject, while on their face mutual, were in effect for the benefit of the United States alone, France much preferring to revert to the statu quo.
Later during the negotiations an offer was made by ns “to extinguish by an equivalent of 8,000,000 francs certain claims of France under the former treaties ” (ib., 626, 629); but even after all these concessions there was still no satisfactory promise of a result, although the existence of the treaties had in effect been recognized and “indemnity on either side in substance agreed to.” The French now made a counter proposition continuing “ the ancient treaties ” “ as if no misunderstanding had occurred,” providing commissioners “ to liquidate the respective losses,” amending the article as to the use of *384 ports by privateers, which was naturally a capital subject of difference, and providing that if after seven years the seventeenth and twenty-second articles of the treaty of commerce were not re-established no indemnities should be paid, and, further, that the guarantee be converted into a “grant of succor for two millions redeemable by a capital sum of ten millions. (Ib., 627, 628.)
The Americans made a counter proposal, renewing’ their offer of 8,000,000 francs to be paid within seven years in consideration that the United States “ be forever exonerated of the obligation, on their part, to furnish succor or aid under the mutual guarantee,” and that the rights of the French Republic be forever limited to those of the most favored nation. (Ib., 629.) To this the French tersely answered (ib., 630):
“ We shall have the right to take our prizes into your ports ; a commission shall regulate the indemnities owed by either nation to the citizens Of the other; the indemnities which shall be due by France to the citizens of the United States shall be paid for by the United States; in return for which France yields the exclusive privileges resulting from the seventeenth and twenty-second articles of the treaty of commerce and ‘ from the rights of the guarantee of the eleventh article of the treaty of alliance.’ ”
Matters now again reached a halting point; neither side would yield; France acknowledged her real object to be to avoid payment of indemnity, while the United States, on the other hand, could not assent to her views as to the guarantee and use of ports. In considerable heat the ministers par ted. (Ib., 632, 633.) The next day the Americans made another effort, because, as they wrote in their journal (ib., 634), “ being now convinced that the door was perfectly closed against all hope of obtaining indemnities with any modifications of the treaty, it only remained to be determined whether, under all circumstances, it would not be expedient to attempt a temporary arrangement which would extricate the United States from the war or that peculiar state of hostility in which they are at present involved, save the immense property of our citizens now pending before the council of prizes, and secure, as far as posssible, our commerce against'the abuses of capture during the present war; ” therefore they proposed (ib., 636) that as to the treaties aud indemnities, the question should be left open; that intercourse should be free; then, with sugges- *385 toons as to property captured and not definitively condemned and property wbicli might thereafter be captured, they ashed an early interview.
The French still insisted that a stipulation of indemnities involved an admission of the force of the treaties (ib., 635-637), and after argument proposed that the discussion of the indemnities, together with the discussion of article 11 of the treaty v of alliance and articles 17 and 22 of the treaty of commerce, be postponed, but with the admission that the two treaties are “ acknowledged and confirmed * * * as well as the consular convention of 1788; ” that national ships and privateers be treated as those of the most favored nation; that national ships be restored and paid for, and that the “property of individuals not yet tried shall be so according to the treaty of amity and commerce of 1778, in consequence of which a role (Véquipage shall not be exacted, nor any other proof which this treaty could not exact.” So, after months of negotiation,the French ministers come back flat-footed upon the treaties as still existing, somethiflg which our representatives were forbidden by their instructions to admit. Nevertheless this proposal formed the text for discussion, and upon so slight a foundation was built the treaty of 1800.
After proion ged negotiation, and after striking out the word “ provisional ” in the name or description of the new treaty, the American commissioners signed it,' although with great reluctance, “ because they were profoundly convinced that, considering the relations of the two countries politically, the nature of our demands, the state of France, and the state of things in Europe, it was [their] duty, and for the honor and interest of the Government and people of the United States, that [they] should agree to the treaty rather than make none.” (Ib,, 640.)
The vital effect of this negotiation as explanatory of the treaty , of 1800, upon which the rights of these claimants are founded, explains the rehearsal of its details during which the so-called-ultimatum of our Government was abandoned and the contention of the French Government as to the existence of the treaties was admitted.
Starting under their instructions, events had forced the ministers to offer unlimited recognition of the treaties of 1778, coupled with a pecuniary equivalent to extinguish in the future their most onerous provisions (ib., 643); even this was not accepted, *386 and the French, returning to their original ground, said that no indemnity could be granted unless the treaties were recognized without qualification as to the future, and this, they said, with the avowed object of avoiding the payment of indemnity. (Ib.) The American ministers had then but two courses open to them, either to quit France, leaving’ the United States involved in a dangerous contest, or to propose a temporary arrangement, reserving for later adjustment points which could not then be satisfactorily settled. (Ib., 644.) They elected the latter course, and the treaty signed at Paris the, 30th day of September, 1800, by Ellsworth, Davie, and Murray, on the one hand, and J. Bonaparte, Fleurieu, and Boederer, on the other, became part of the supreme law of the laud, and was so proclaimed by the President the 21st day of December, 1801.
But between its signature and proclamation a very important history intervened, one extremely interesting to the. claimants at this bar, and which has been the cause of much argument and contention.
The compromise by our ministers, to which they were forced by the position of the French Government, was contained in the second article, which read :
“ The ministers plenipotentiary of the two parties not being able to agree at present respecting the treaty of alliance of 6th February, 1778, the treaty of amity and commerce of the same date, and the convention of the 14th of November, 1788, nor upon the indemnities mutually due or claimed, the parties will negotiate further on these subjects at a convenient time, and until they may have agreed upon these points the said treaties and conventions shall have no operation, and the'relations of the two countries shall be regulated as follows.”
It is apparent that this article makes the treaty temporary and provisional in its nature; it admits that the existence or non-existence of the treaties of 1778, with the liabilities thereby •imposed, is open to discussion, and that , the indemnities are not provided for; that is, that the very first of the so-called “ultimata” of Secretary Pickering is temporarily abandoned. The Senate advised and consented to the ratification of the treaty provided this article be expunged, and in its place the following article be inserted:
“It is agreed that the present convention shall be in force for the term of eight years from the time of exchange of ratifications.”
*387 Napoleon thereupon consented (July 31, 1801) “to accept, ratify, and confirm” the convention, with an addition importing that it shall be in force for the space of eight years, and with the retrenchment of the second article:
“Provided, That by this retrenchment the two states renounce the respective pretensions which are the object of the said article.”
The ratifications were exchanged in Paris, July 31, 1801.' The treaty, with its addenda, was again submitted to the Senate, and in that form received the approval of that body (Dec. 19, 1801), when it declared that it considered the convention “fully ratified,” and returned it to the President for promulgation.
What the respective pretensions were which were the subject of the second article does not admit of a shadow of doubt: on the one hand, the alleged continuing existence of the treaties incidentally involving national claims for past acts on our part and more particularly a right to future privileges ; on the other hand, indemnity to our citizens for spoliations.
Our claims were good by the law of nations, and we had no need to turn bade to the treaties for a foundation upon which to rest our arguments. Not so with France. Her national claims must necessarily rest on treaty provisions, and the future privileges she desired above all else could in no way be so easily or fully secured as by an admission of the continuing force of those instruments. She therefore insisted that for indemnity Ave must give treaty recognition. This we absolutely refused to do, and upon this' rock tAvice did the negotiations split, only to be renewed by the patience and patriotism of our ministers. After mouths of weary discussion the parties stood •as to this point exactly where they started, and to save their young and struggling country, irom further contest the American ministers consented to the compromise. Then the Senate struck the compromise out, and France said in effect, “ Yes, Ave agree, if it is understood that we mutually renounce the pretensions which are the subject of that article,” to which the Senate and the President, by their official action, assented.
So died the treaties of*l'778, Avith all the obligations which t they imposed, and Avith them passed from the field of international contention the claims of American citizens for French : spoliation.
*388 In this whole transaction the treaties were urged on the one side against indemnities on the other. Admission of the continuing force of the treaties was the great desire of France to which she subordinated all else, even her national claims; on the other hand, the United States could by no possibility admit such a contention, for to do so would set them instantly at odds with their former enemy. Having given, in 1794, to Great Britain the exclusive port privileges secured to France in 3778, they could not in 1800 again reverse their policy, and, by returning these privileges to France, infringe their agreement with Great Britain.
Yet this was the issue, an issue never retreated from by the French; as they put it, “either the ancient treaties with indemnity [for spoliations] or a new treaty without indemnity.” Article 2 of the treaty of 1800 still presents these counter propositions linked together wheu it postpones the discussion of the treaties, and at the same time postpones the discussion of the indemnities.
When the United States struck out that second article and assented to Napoleon’s proviso that by so doing both states renounced the pretensions which were its object (that is, the treaties and these claims), the contract was complete. That there was a “ bargain,” to use Madison’s word, is apparent from the instrument and the negotiations which have been recited as preceding it.
Four years .later Mr. Madison, then Secretary of State, instructed Mr. Pinckney, minister in Spain, that “ the claims from which France was released were admitted by France, and the release was for a valuable consideration in a correspondent release of the United States from certain claims on them. The claims we make on Spain were never admitted by France nor made on France by the United States. They made, therefore, no part of the bargain with her, and could not be included in the release.”
The counsel for defendants contends that Mr. Madison referred in this letter to “ national” claims on the part of the United States for national injury, in the destruction of commerce, the increased cost of the Armf and Navy, and the insult to the flag. It shpuld be noted, in answer to this position, that the claims against Spain, then under discussion, were exactly these claims now at bar, except that Spain was the party *389 defendant instead of France., As against France captures made by French privateers under French decrees were taken into French ports, and there condemned. As against Spain captures made by French privateers under French decrees were taken into Spanish ports and there condemned by French consuls under the authority and protection of Spain. Spain plead that these claims were settled by the second article of the treaty of 1800, and it was in answer to this plea that Mr. Madison wrote his letter.
The subject-matter of the instruction to Pinckney was these claims and nothing else, for we were not urging “national” claims on Spain, but the claims subsequently described in the Spanish treaty as those “ on account of prizes made by French privateers and condemned by French consuls within the territory and jurisdiction of Spain.” (Treaty of 1819, Art. 9.) These claims were finally recognized, and paid through the Florida purchase. (Id., Art. 11; see also treaty of 1802.)
But the negotiations of the Ellsworth-mission are conclusive that the claims were not “national” in the sense of governmental as opposed to individual. It is unnecessary to repeat extracts from the correspondence already given, and we need only refer to the project submitted by our ministers, the 18th of April, 1800, which describes the claims as those “ of divers merchants and other citizens of the United States” (Doc. 102, pp. 585-589), thus following their instructions, which called them “ claims of our citizens.” (Ib., 575.)
Mr. Pickering, Secretary of State under the first two Presidents, and who, above all others, was familiar with the situation and with the rights of the parties, said that we bartered “ the just claims of our merchants” to obtain a relinquishment of the French demand, and that—
“ It would seem that the merchants have an equitable claim for indemnity from the United States. * * * The relinquishment by our Government having been made in consideration that the French Government relinquished its demands for a renewal of the old treaties, then it seems clear that, as our Government applied the merchants’ property to buy off those old treaties, the sums so applied should be reimbursed.” (Mr. Clayton’s speech, 1846.)
Mr. Madison, as we have seen, said to Spain that the claims were admitted by France, and were released “ for a valuable consideration,” and he termed the transaction a “bargain.”
*390 Mr. Clay, in the Meade Case,,in which his opinion was given in 1821, five years prior to his report upon French spoliation», said that while a country might not be bound to go to war in support of the rights of its citizens, and while a treaty extinction of those rights is probably binding, it appears—
“ That the rule of equity furnished by our Constitution, and which provides that private property shall not be taken for public use without just compensation, applies and entitles the injured citizen to consider his own country a substitute for the foreign power.” .
In this conclusion Chief-Justice Marshall strongly concurred, saying to Mr. Preston—
“ Having been connected with the events of the period and conversant with the circumstances under which the claims arose, he was, from his own knowledge, satisfied that there was the strongest obligation on the Government to compensate the sufferers by the French spoliations.” (Clayton’s speech, 1816.)
And he repeated to Mr. Leigh distinctly and positively “that the United States ought to make payment of these claims.”
This view of the distinguished jurist and diplomatist is sustained by forty-five reports favorable to the claims, made in the Congress, against which stand but three adverse reports, all of which were made prior to the publication of the correspondence by Mr. Olay in 1826. Besides Marshall, Madison, Pickering, and Olay, the validity of the claims has been recognized by Clinton, Edward Livingston, Everett, Webster, Cushing, Choate, Sumner, and many other of the most distinguished statesmen known to American history, and while opponents have not been wanting, among the most eminent of whom were Forsyth, Calhoun, Polk, Pierce, Silas Wright, and Benton, still the vast weight of authority in the political division of the Government has been strenuous in favor of the contention made here by the claimants.
The judiciary has seldom occasion to deal with the abstract right of the citizen against his Government; for in a case raising such a question'the individual is without remedy other than that granted him by the legislature. The question of right, therefore, is usually passed upon by the political branch of the Government, leaving to the courts the power only to construe the amount and nature of the remedy given. Still judicial authority is not wanting in support of the position that by the agreement with France the United States became liable *391 over to tbeir individual citizens. Lord Truro laid down in the House of Lords as admitted law—
“ That if the subject of a country is spoliated by a foreign .Government he is entitled to redress through the means of his own Government. But if from weakness, timidity, or any other cause on the part of his own Government no redress is obtained from the foreign one, then he has a clai m against his own country.” (De Bode v. The Queen, 3 Clarke’s House of Lords, 464.)
The same position is sustained by that eminent writer upon the public law, Vat tel, who held that while the sovereign may dispose of either the.person or .the property of a subject by treaty with a foreign power, still, “ as it is for the public advantage that he thus disposes of them, the state is bound to indemnify the citizens who are sufferers by the transaction.” (Book 4, cli. 2.)
Napoleon, from his retirement in St. Helena, testified that by the suppression of the second article of the treaty of 1800 the privileges which France had possessed by the treaty of 1778 were ended, and the “just claims which America might have made for injuries done in time of peace” were annulled, adding that this was exactly what he had proposed to himself in fixing these two points “as equi-ponderating each other.” (Gourgaud, Memoirs, vol, 2, p. 129.)
Finally, Senator Livingston, familiar with the whole subject as a contemporary, in his report upon it to the Senate, said:
“The committee think it sufficiently shown that the claim for indemnities was surrendered as an equivalent for the discharge of the United States from its' heavy national obligations, and for the damages that were due for their preceding non-performance of them. If so, can there be a doubt, independent of the constitutional provision, that the sufferers are entitled to indemnity'? Under that- provision is not this right converted into one that we are under the most solemn obligations to satisfy “í To lessen the public expenditure is a great legislative duty; to lessen it at the expense of justice, public faith, and constitutional right would be a crime. Conceiving that all these require that relief should be granted to the petitioners, they beg leave to bring' in a bill for that purpose.”
The word “ national” has been largely used in argument in allusion to the different kinds of claims at different periods brought into the discussion, and is a convenient word if clearly understood in the connection in which it is used. All claims are “ national” in the sense of the jus gentium, for no nation deals as to questions of tort witli an alien individual; the rights *392 of that individual are against bis Government, and not until that Government has undertaken to urge his claim — not until that Government has approved it as at least jprima facie valid— does it become a matter of international contention; then, by adoption, it is the claim of the nation, and as such only is it regarded by the other country. The name of the individual claimant’may be used as a convenient designation of the particular discussion, but as between the nations it is never his individual claim, but the claim of his Government founded upon injury to its citizen. Nations negotiate and settle with nations; individuals have relations only with their own Governments. Other claims, sometimes the subject of argument, rest upon injury to the state as a whole; of these an apt illustration is found in the so-called “indirect” claims against Great Britain, disposed of in the arbitration of 1872, and in the claims advanced by'France for injiiry caused by non-compliance with the treaties of 1778.
Thus, while all claims urged by one nation upon another are, technically speaking, “ national,” it is convenient to use colloquially the words “national” and “individual” as distinguishing claims founded upon injury to the whole people from those founded upon injury to particular citizens. Using the words in this sense, it appears that in the negotiations prior to the treaty of 1800, and in effect in the instrument itself, national claims were advanced by France against individual claims advanced by the United ¡States. France urged that she had been wronged as a nation; we urged that our citizens’ rights had been invaded. If “ national” claims had been used against “ national” claims, and the one class had been set off against the other in the compromise, of course the agreement would have been final in every way, as the surrender and the consideration therefor would have been national, and no rights between the individual and his own Government could have complicated the situation. But in the negotiation of 1800 we used “individual” claims against “ national” claims, and the set-off was of French national claims against American individual claims. That any Government has the right to do this, as it has the right to refuse war in protection of a wronged citizen, or to take other action, which, at the expense of the individual, is most beneficial to the whole people, is too clear for discussion. Nevertheless, the citizen whose property is thus sacrificed for *393 the safety and welfare of his country has his claim against that country; he has a right to compensation, which exists even if no remedy in the courts or elsewhere be given him. A right often exists where there is no remedy, and a most frequent illustration of this is found in the relation of the subject to his sovereign, the citizen to his Government.
It seems to us that this “ bargain” (again using Madison’s word), by which the present peace and quiet of the United States, as well as their future prosperity and greatness were largely secured, and which was brought about by the sacrifice of the interests of individual citizens, falls within the intent and meaning of the Constitution, which prohibits the taking of private property for public use without just compensation. We do not say that for all purposes these claims were “property” in the ordinarily accepted and in the legal sense of the word; but they were rights which had value, a value inchoate, to be sure, and entirely dependent upon adoption and enforcement by the Government; but an actual money value capable of ascertainment the moment the. Government had adopted them and promised to enforce them, as it did in August, 1793, and constantly thereafter. That the use to which the claims were put was a public use cannot admit of a doubt, for it solved the problem of strained relations with France and forever put out of existence the treaties of 1778, which formed an insuperable obstacle to our advance in paths of peace to the achievement of commercial greatness.
The defendants urge further that the treaty of 1803 finally disposed of all pretensions of citizens of the United States in regard to these spoliations.
One ot' the principal objects of this treaty is found in the instructions to Mr. Livingston, our minister, wherein the Secretary of State directed his particular attention to claims embraced in the fourth article of the treaty of 1800, describing them as arising from : “(1) Oases of capture wherein no judicial proceedings have been had; (2) cases carried .before French tribunals, and not definitively decided on the 30th September, 1800; (3) captures made subsequent to that date.” (Madison to Livingston, Sept. 28, 1801, Doc. 102, p. 701.)
Accordingly Mr. Livingston in January following complained to the French Government of infractions of the existing treaty (of 1800) in relation to “vessels taken after its signature,” “ ves- *394 seis previously taken where no judicial proceedings had been had,” “ vessels on which no definitive sentence had been given before that day,” or which were removable to the council of prizes; these are fourth-article claims embraced in the modus vivendi therein provided. Claims for vessels which were to have been restored are clearly not claims which had matured prior to September 30, 1800, when the treaty was signed. (Ib., 704.)
In the next mouth (February 24,1802) Mr. Livingston speaks of the differences as “ debts,” about which he must transmit to his Government a statement of the measures about to be adopted by France, “ with a view either to afford it the satisfaction that it will always feel in contributing to the interests of France * * * or of putting a stop to credits that must be ruinous to its citizens already suffering under heavy losses sustained by the detention of a considerable capital in the hands .of the French Government.” (Ib., 708.) It is thus apparent that these claims, in the view of the negotiator, rested substantially on contract, and it is further apparent from the text of the note that these contracts were for supplies to the French fleets and armies.
This is the first subject of negotiation; the second is as to-the council of prizes, about which there were “daily complaints of their entire disregard of the treaty,” so much so that when a vessel was ordered restored it was sent back in a damaged state and charged with cost of “ detentiou, storage, <&c.” Fourth-article claims these, as we have already seen.
Livingston later (April 17, 1802), in discussing the fifth and second articles of the treaty of 1800, says :
“The fifth article expressly stipulates that all debts due by either Government to the individuals of the other shall be paid, but as this would also have included the indemnities for captures and condemnations previously made, and it was the intention of the contracting parties, by the second article, to preclude this payment as depending on a future negotiation, it was necessary to except from this promise of payment all that made the subject of the second article. * * * On its [the second article] being erased, the fifth article stands alone as a promise to pay, with the single exception of indemnities for captures and condemnations.” (Ib., 717.)
And he adds that so far as relates to indemnities for captures aud condemnations which had been made previous to the signature of the treaty his demands could not be supported.
*395 It seems hardly necessary to quote further from the'correspondence, which shows thatMr. Livingston not only never had in mind, but expressly excluded, second-article claims, directing his attention first to debts, “ confirmed by treaty,” as he says (ib., 729), and second, to yessels seized during or after the negotiation of the treaty of 1800; that is, claims “confirmed,” to use his word, by that treaty’s fourth and fifth articles. .
The distinction between different classes of claims then existing between the United States and France must be clearly marked ouc before the treaty of 1803 can be properly understood. The second article of the treaty of 1800 covered claims for illegal seizures and condemnations which were tied to the treaties of 1778. But all the illegal captures were not covered by that second article, for the fourth article treated of others; that is, of “ property captured, and not yet definitively condemned, or which may be captured before the exchange of ratifications ; ” and this property, it was agreed, should be restored. That is, while the negotiations of the Ellsworth missiou were proceeding the French decrees remained in force and spolia-tions had not stopped; the cases of some seized American vessels were then pending before the French tribunals, and these were the ones to be restored if. not “ definitively condemned ” by the time the treaty became a law; others might be seized pending the discussion and before exchanged of ratifications ; in fact such seizures were made, and these also were to be restored.
Additional proof that this fourth article was in effect a mere modus vivendi is found in its concluding paragraph, which provides that it shall take effect from the date of signature, not from the exchange of ratifications, and that if any property should be condemned — that is condemned in the future — before knowledge of the stipulation “shall be obtained, the property shall without delay be restored or paid for.” Now, the property covered by this article, to wit, that then before the tribunals or which might thereafter come before the tribunals before the new treaty took effect, never was restored or paid for, although spoliations continued for some time.
It is important here to note the distinction- between the position as against the French Government of cases pending during the negotiation or which might thereafter arise and that of cases now before this court wherein the condemnation *396 bad occurred before. This claim and those like it were “ claims to indemnity” merely; the property had disappeared and could not be restored, the French tribunals had definitively acted, and payment for it would be made only upon admission by the United States of the continuing force of the ancient treaties; while, as to then pending cases the property could be restored, or in case of mistaken sale its value could be easily and immediately ascertained, and the fourth article absolutely promised restoration or payment.
The agreement of 1803 is contained in three instruments forming the contract by which we acquired Louisiana; these treaties give no rights to these claimants, as is popularly supposed; on the contrary, it is contended by the Government that any rights which ever existed were destroyed by them. The third treaty, providing for the payment of “ sums due by France to the citizens of the United States,” is the only one bearing upon these cases.
Article 1 provides that these “sums,” called “debts,” contracted before September 30,1800 (the date of the prior treaty), shall be paid, with interest.
Article 2 describes the debts as those set forth in an annexed conjectural note, which is a list of claims allowed by the French accounting officers for such articles as rice, flour, salt beef, cloth, leather, cotton and indigo, wines and spirits; while article 6 limits the preceding articles to debts still due American citizens yet creditors of France “for supplies, for embargoes, and prizes made at sea in which the appeal has been properly-lodged within the time mentioned in the convention” of 1800. But there is no such time mentioned in that convention, nor is there a word in it looking to any appeal whatever from decisions of inferior tribunals; the only provision about prizes in that treaty is that contained in its fourth article, directing that in the future they be restored.
Proceeding now to article 5 of this somewhat mysterious instrument of 1803, we find another limitation upon the preceding articles, to wit, that they shall cover only captures wherein the council of prizes has ordered restitution if the claim was valid against France, and then only in case of “insufficiency of the captors,” i. e., that the privateer’s bond was not good. Further, it shall apply to debts mentioned in the fifth article of the treaty of 1800, that is, “'debts” (not claims for damage *397 by tort) due by one. nation to citizens of the other, and this fifth article of 1800 expressly .bars claims for captures or confiscations, while the fifth article of 1803' expressly does not comprehend “prizes whose condemnation has been or shall be confirmed.” Therefore, by this series of limitations, the scope of the treaty of 1803 is confined on its face, and so far as the cases at bar are interested in it, “to captures, of which the council of prizes shall have ordered restitution,” provided the claim was a valid one.and the captor insufficient. Really, there does not seem very much left of it, so far as “embargoes and prizes-made at sea” (Art. 4) are concerned.
The significant fact is stated to us by counsel in this connection that there were presented to the commission formed under the treaty of 1831, which we shall soon have occasion to examine, claims for two vessels, the Caroline and the Orlando, which were rejected upon the express ground that the captures were made prior to September 30, 1800. Further, the report of the board under the treaty of 1803 shows that only eight captures at sea were allowed, a ridiculously small number if the class of claims now at bar were within the jurisdiction of that tribunal.
That the settlement and payment of “debts,” not of claims for tort, was the primary object of the treaty of 1803 is explained in its preamble and is apparent from its text, while the treaty of 1800 dealt with torts a,nd indemnities for wrongs committed upon our commerce. The claim for debts was not sacrificed by the treaty of 1800, but kept alive by the fifth article, which, in further proof of the abandonment of claims for tort, explicitly excepted from the benefits of its provisions all “indemnities claimed on account of captures and confiscations.” But these “ debts contracted by one of the two nations with individuals of the other” were not paid as the treaty of 1800 promised, nor, as Mr. Livingston said to the French Government in 1802, was there the most “ distant hope of their payment.” (Doe. 102, p. 714.)
The association of the second and fifth articles of the treaty of 1800 in the preamble of the treaty of 1803 has been deemed significant as showing an intention to revive and settle the second-article claims now commonly known as “spoliation” claims, whereas the allusion was intended to reaffirm the exclusion of these claims already made by the second article; for *398 the fifth article (1800) includes “debts” which are to be settled and expressly excludes “indemnities;” that is, excludes the subject-matter of the second article, which was not to be settled; so that France, being desirous in 1803, as the preamble says, “in compliance with the second and fifth articles of the convention of 1800 to secure the payment of the sums due by France to the citizens of the United States,” covenanted to pay “debts,” not indemnity for torts other than those specified, and which had been turned into debts by the fourth article of the treaty of 1800. To put it in another form: as the original second article had ceased to exist, and was replaced by a provision that the treaty should last eight years, of course a reference to this new second article in the treaty of 1803 would have been absurd; so we must conclude that the negotiators referred to the original second article, the article which had been expunged by agreement. That article, so far as claims of citizens were concerned, referred to torts and nothing else; the fifth article referred to “ deb.ts,” and provided that payment should be made therefor ; and then went on to make an express exclusion from its benefits of claims for captures and confiscations, that is, claims arising from torts which were covered by the second article as it then stood. * What more fiatural, then, that, in rehearsing the objects of the treaty of 1803, the two articles should ' be brought together in the preamble, the fifth article as embracing the debts due and the second article as covering the express exception made in the fifth article, which “includes debts contracted,” and excludes “indemnities claimed on account of captures and confiscations?” The language of the preamble is, therefore, in compliance with the second as well as with the fifth articles of the treaty of 1800.
We are of opinion that the treaty of 1803 had no reference to the claims embraced in the second article of the treaty of 1800.
Turning to the particular case now on trial we consider it with the principle admitted that the claims popularly known as “ French spoliation claims ” were, as a class, and if embraced in the description of the second article of the treaty of 1800, valid claims against France, which were surrendered by our Government for the valuable consideration found in a release from the obligations of the treaties of 1778, and that, by this *399 action, the Government of the United States assumed the liabilities of France in regard to them, and is in duty bound to recompense the individuals who suffered loss by the illegal captures and condemnations.
The findings show that the schooner Sally, owned by Americans, commanded by an American, and laden with an American cargo, while on a commercial voyage from Massachusetts to Spain, was, on the 5th day of June, 1797, seized by the French privateer Intrépido, taken to the port of Nantes, there condemned by a French tribunal, and “confiscated” for the benefit of the privateer. It was not alleged tha't she had violated the law of nations, either by attempting a blockade or by carrying contraband, or in any other manner, but that she had violated a local French municipal regulation “ concerning the navigation of neutrals.” It appears upon the face of the decree that the Government of France, through laws passed by,, its own legislature, valid within its territorial jurisdiction and; upon its own ships, but not elsewhere, attempted to regulate \ the conduct of neutral merchantmen upon the high seas, where ¡ they were subject only to the laws of their own country and / that law of abstract right and justice which by mutual consent has become crystallized into the law of nations.
To learn wherein the schooner violated the French decree we must turn to the findings, which rehearse the judgment of the tribunal, as follows:
“ That while the master may be correct in the sum total of his clearance papers he is flagrantly at fault as to his crew-list,” and “ considering that the obligation common to the French nation and to the United States, and which constitutes the safety of their respective navigation, is defined by the .treaty of February 6, 1778, which decides, articles 25 and 27, that every captain who receives a passport must be provided with a list, signed and attested by witnesses, containing the names and surnames and place of birth and residence of the persons composing the crew of his ship and of all persons embarking upon her, which he will not receive without the knowledge and permission of the naval officers. Considering that the memorandum or crew-list fulfills none of these formalities, inasmuch as it is unsigned, that the places of birth and residence of the men composing the crew are not declared, and the permission of the naval officer is not given ; considering that *400 article 6 of section 7 of the marine regulations of 1781 declares to be lawful prize the cargoes of confiscated ships,” and “ considering finally that article 4 of the decree of the Executive Directory of the 12th Yentose, year five, i's clear and precise, and that it declares to be a good and lawffil prize every American ship which shall not have a crew-list in due form such as is described by the model annexed to the treaty of February 6, 1778,” therefore,, the court, in conformity with these laws, and especially wifh article 4 of the said decree, declared valid the capture of the Sally and her cargo, and declared the captain to belong to the “ enemies of the Republic” because he did not have a crew-list in conformity with the French decree.
■ The vessel and cargo were confiscated because the crew-list, the “ róle d’eguipage,’' was not in form, although there is not a word or sentence, as the French afterwards admitted (Doc. 102., p. 637), in the treaties of 1778 requiring any such document. The French decree required it, but we cannot admit that the government of a foreign country may stretch its arm over the ocean, and, seizing an American vessel, direct it as to the papers it shall carry, under penalty of confiscation. There is no allegation in the proceeding that the Sally did not have all the papers, other than this crew-list, required by the treaty of 1778 and the laws of the United States. In fact, the court itself admits this in saying that the captain is correct “ in the-sum total of his clearance papers, * * * but flagrantly in fault as to his- crew-list.” How flagrantly at fault? He had complied with the laws of his country, he had not violated a provision of the treaties of 1778, and it is not hinted that he infringed the law of nations or intended to do so.
The confiscation rests upon the decree of March 2, 1797, authorizing the seizure and condemnation of every American, vessel not having on board “ a role dl equipage, in proper form,, such as is prescribed by the model annexed to the treaty of the 6th of February, 1778.” Á “ role dy equipage ” is for all practical purposes a “ crew-list,” although technically, under French regulations, it contains the names of all on board, including the passengers. Still “ crew-list ” is a sufficient translation for the purposes of this case.
The treaty of 1778 required vessels of each party to be furnished with a passport and a certificate as to her cargo and destination, but no mention whatever is made of a crew-list.. *401 Seizures on account of the lack of this instrument were, however, made even before the decree of March, 1797, and onr consul-general, in calling attention to this fact, said to the minister of foreign affairs (Feb. 23,1797, ib., 155):
“ By no regulations of the United States are our ships subjected to this formality; and not one of our vessels has (róle cP equip a ge) a crew-list thus countersigned. Moreover, in the different treaties and conventions that connect Frauc.e with America there is not found a single article sufficient to justify the doctrine set forth by the privateer. * * * I consider it unnecessary for me to communicate on this subject the right and supreme law of nations, being persuaded that you will think with me that every free and independent- nation should possess the exclusive right to establish regulations for the management of their own navigation; and that no nation possesses the right, to subject the citizens of another power to formalities to be observed in a foreign country not exacted by the laws of said country or by those to which said citizens belong. * * * The principle which the captain [of the privateer] desires to see established would lead to the condemnation of all the ships belonging to my nation actually found in the different ports of France, under the taith of treaties, and to authorize the cruisers of the Bepublic to capture all our merchantmen.”
Mr. Pinckney afterwards (May 15, 1797, ib., 171) writes :
“Our papers are, as they ought to be, according to the maritime laws of our country.”
And again (June 28, 1797, ib., 176):
“ Mr. Adet [tbe French minister] arrived at Havre in an American ship without a role d’equipage. The Oonrrier Maritime du Havre * * * infers that Mr. Adet must have been convinced, with all other publicists, that a róle d’équipage was not necessary, and that all that was requisite was a passport conformable to the model annexed to the treaty of 1778.”
Mr. Pickering, then Secretary of State, wrote the next year (Dec. 13, 1798, ib., 429):
“There is no shadow of foundation for the claims set up by the French Government of the necessity of our vessels being provided with a róle d’équipageP
In default of express treaty provision no Government can prescribe to our merchantmen navigating the high seas the detailed form and number of the papers they are to carry, nor seize or confiscate those merchantmen for non-compliance with that nation’s municipal statutes. The seizure of this vessel, *402 and of others under like conditions, was clearly illegal and unjustifiable.
The defendants say, further, the condemnation cannot be illegal because made by a prize court having jurisdiction, and the decisions of such courts are final and binding. This proposition is of course admitted so far as the res is concerned; the decision of the court, as to that, is undoubtedly final, and vests good title in the purchaser at the sale; not so as to the diplomatic claim, for that claim has its very foundation in the judicial decision, and its validity depends upon the justice of the court’s proceedings and conclusion. It is an elementary doctrine of diplomacy that the citizen must exhaust his remedy in the local courts before he can fall back upon his Government for diplomatic redress; he must then present such a case as will authorize that Government to urge that there has been a failure of justice. The diplomatic claim, therefore, is based not more upon the original wrong upon which the court decided than upon the action and conclusion of the court itself, and, diplomatically speaking, there is. no claim until the courts have decided. That decision, then, is not only not fiual,’but, on the contrary, is the beginning, the very corner-stone, of the international controversy. This leads us naturally to another point made by the defense in that the claimant did not u exhaust his remedy,” because he did not prosecute an appeal. We of course admit that usually there is no foundation for diplomatic action until a case cognizable by the local courts is prosecuted to that of last resort; but this doctrine involves the admission that there are courts freely open to the claimant, and that he is unhampered in the protection of his rights therein, including his right of appeal. It is within the knowledge of every casual reader of the history of the time that no such condition of affairs in fact then existed.
The very valuable report of Mr. Broadhead shows (pp. 6 and 7) 'that prior to March 27, 1800, there was practically no appeal in these cases except to the department of the Loire-Inférieure; in the then existing state of bad feeling and modified hostilities, and under the surrounding circumstauces, this wa.s to the captains of the seized vessels, in most if not in all cases, a physical-impossibility. Nor prior to the agreement of 1800 was there any practical reason for appealing to a court when the result, as our seamen believed, whether rightly or *403 not, but still honestly, was a foregone conclusion, and while negotiations were progressing for a settlementnor is there anything in these negotiations showing that a technical exhaustion of legal remedy would be required. We are of opinion that the claimant was not, under these purely exceptional circumstances, obliged to prosecute his case through the highest court, even if he could have done so, which we doubt.
This court is forbidden by the act conferring jurisdiction not only to examine claims embraced in the treaty of 1803, which we have considered, but also those allowed and paid in whole or in part under the treaty of 1819 with Spain and those allowed in whole or in part under the treaty of 1831 with France.
The reference heretofore made in this opinion to the Spanish treaty is sufficient to show its inapplicability to vessels seized on the high seas by a French privateer, taken to a French port and there illegally condemned and confiscated; so that treaty may be thrown out of the consideration of this case.
The treaty of 1831 is a claims treaty, by which the French Government, “ in order to liberate itself completely from all the reclamations preferred against it by citizens of the United States for unlawful seizures, cai>tures, sequestrations, confiscations, or destructions of their vessels, cargoes, or other property,” agreed to pay 25,000,000 francs to the United States, for distribution (Art. 1), while the United States on their part agreed to pay to France for claims, described in language somewhat similar, the sum of 1,500,000 francs (Art. 3). As to other claims each country opened its courts to the citizens of the other, and finally France abandoned its demands under the eighth article of the Louisiana treaty in return for a reduction of duties upon French wines.
The wording of this treaty is broad enough at first glance to sustain the defendants’ contention that these claims are included in it; but treaties aud statutes, like every other docu- ■ ment, must be read in the light of the facts as they existed at the time. A treaty now made with Great Britain providing a settlement of “all claims” could not be held to reopen the proceedings of the Geneva arbitration and to authorize payment of claims there dismissed, for the award was final, both as to what was allowed and as to what was refused. Nor could a similar general convention with France permit an opening of the proceedings of the Franco-American Commission with pos *404 sible payment of claims there refused and declared forever barred.
Such treaties look not to dead issues, but to living peuding claims, forming at the time a subject of contention between the Governments, and not to those universally regarded as finally settled. Claims of the class of the one at bar had been disposed of in 1801, when the President and Senate concurred in Napoleon’s stipulation as to the second article, and since that time, although they had been constantly pressed upon the United States as an obligation of that Government to its citizens, they nowhere appear as a subject of discussion between the nations.- France, by the treaty of 1831, desired to -liberate itself from' claims “preferred against it” by citizens of the United'States, but these spoliation claims were not then being' preferred against it; on the contrary, since 1801 the claimants had turned their attention exclusively to the United States, recognizing the force and effect of what was called the “ retrenchment of the second article.” The French Government clearly understood this treaty of 1831 as excluding all American claims of every description originating prior to the treaties of 1803. '(Ex. Doc. 147, 22d Gong., 2d sess., p. 165.)
Our commissioners who distributed the fund also so understood it, and required every claimant to show that his “ claim remained unimpaired and in full force against France ” in 1831. (House Ex. Doe. 117, 24th Cong., 1st sess., p. 4.) But these spoliation claims had not only been impaired but destroyed as a French obligation by the treaty of 1800; many cases of captures made prior to September 30, 1800, were presented to the board and rejected. (Sumner’s Report, p.. 35.)
A broad distinction is made in the remedial statute (January 20, 1885) between the claims described in these different treaties of 1803, 1819, and 1831. As to the treaty of 1803‘the act does not extend to claims “ embraced ” in its provisions ; as to the treaty of 1819 the act does not extend to claims “ allowed and paid in whole or in part” under its provisions; as to the treaty of 1831 the act does not extend to claims “ allowed in whole or in part” under its provisions. It is not contended tl\at this claim was “ allowed in whole or in part ” under the provisions of the treaty of 1831.
We have not considered the point that the -treaties of 1778 were abrogated by the act of Congress passed in 1798. That *405 question, which the ablest minds of the period were unable to solve, and which proved an ever present and enduring obstacle to all negotiation until forcibly removed by Napoleon, with our concurrence, we fortunately are not .forced to deal with. The rights of this claimant rest upon no convention, but are founded upon international law. Treaty or no treaty, a foreign nation cannot be permitted to confiscate an American merchantman engaged in legitimate commerce upon the high seas because his crew-list does not fulfilL the requirements of that nation’s local ordinances. That the act of Congress was binding within the jurisdiction of the United States and was necessarily to be so regarded by our courts does not now admit of question. The treaties were, however, not only part of the supreme law of the land wherein they were replaced, within the jurisdiction of the Constitution, by a later supreme law, to wit, a statute; but they were also, as between the two Republics, contracts, which one of the parties attempted to annul. Treaties containing no clause fixing their duration are, under certain circumstances, voidable at the option of one party. Whether there existed in 1798 such circumstances as authorized and made valid an abrogation of the treaties of 1778 by the United States was the very question left unsettled by the treaty of 1800, the one question upon which by no possibility apparently could the parties agree.
Forthe same reason we find it unnecessary to examine howfar the French violated the agreement by their treaty of 1786 with Great Britain (15 Martens Recueil de Traites, 2 ed., vol. 4, p. 155), or the effect, by way of abrogation of these agreements, of the Jay treaty, or the change in the form of government in France.
Some argument has been made as to the ownership of this claim, based upon the provision of the statute that the court shall determine “ the present ownership, and if by assignee, the date of the assignment, with the consideration paid there* for.” (§ 3.) Whatever may have been the intention of Congress in inserting this provision, its terms are perfectly clear; the findings of fact show in this case that the claimant is the administrator with the will annexed of the owner of the Sally, and show all other facts necessary to a decision upon the subject, except as to one of the defendants’ points; as to this we cannot agree that Congress intended this court to perform what *406 is in effect a physical impossibility and to throw upon us the task of probate courts in the investigation of the rights of thousands of descendants and devisees of theoriginal claimants, who are now scattered," in all human probability, to the four quarters of the globe. To ask this court to go back to the year 1800 and follow from that time down the succession of every then existing claimant is to ask us to do that which under our jurisdiction and powers would be an impossibility. A much more reasonable interpretation of the act appears upon its face, and applying that interpretation to this case we have found that the claimant, as administrator of the owner of the schooner Sally, is the owner of the claim. We consider it no part of our duty under the statute to place ourselves in the position of a court of probate and report to Congress the manner in which any ultimate recovery should under the laws of the thirty-eight States and eight Territories of this Union be distributed among the numerous next of kin or devisees of the original claimants and their descendants. The administrators are officers of those probate courts, subject to their jurisdiction aud control, and presumably have filed adequate bonds for the honest and proper-performance of the trust reposed in them.
Congress asks us for two facts: First, the present ownership. The owner, both in law and equity', ihe Supreme Court has said, is the administrator (Villelonga’s Case, 23 Wall., 35), and that suffices for this particular case. Secondly, Congress asks, where there has been an assignment, not only the name of the present owner, but the date of the assignment and the consideration paid therefor. Of course these facts will be reported when such a case is presented.
So we reach the end of this opinion as unlike the usual judicial expression in its form and supporting authorities as are the cases before us unlike those ordinarily submitted to a tribunal of the law. We are, however, for the moment invested with some of the powers and jurisdiction belonging to the political branch of the' Government, and upon us is imposed an examination not usually' or naturally committed to a judicial body. We have been required not to investigate legal rights^ based upon the doctrines and principles of the common law, \ but to inquire into and to report upon the ethical rights of a citizen against his Government; rights which are never enforceable except by the consent of the sovereign — in this coun-, *407 try the legislature — as whose substitute we act to the limited extent ijresoribed and marked out by the remedial statute.
The result which we have reached is supported by resolutions passed in each of the thirteen original States, by twenty-four reports made to the Senate by its committees, by over twenty similar reports made to the House of Representatives, by the fact that while three adverse reports have been made, one to the Senate and two to the House, no adverse report has been made in either body since the publication of the correspondence in 1826, and by the further facts that the Senate has passed eight bills in favor of these claimants, and the House has passed three of these, of which one is the preseut law, the other two having been vetoed, one by President Polk, substantially upon grounds not at this time important, the other by President Pierce for reasons which we have considered very fully in this opinion, and with which, after the most careful and painstaking consideration, we cannot agree.
The arguments of counsel for claimants, marked as they were by ability, industry, and a frank desire for a just ascertainment of the rights involved, have been of great assistance to us; while the learned assistant attorney for the United States has presented the defense with a zeal and force of argument which we do not find in the history of the long discussions it has heretofore received.
The chief Justice and all the judges concur in this opinion, and we shall, in accordance with the statute, report to Congress the conclusions of fact and law in this claim, together with a copy of this opinion, which contains (using the words of the statute) the conclusions which, in our judgment, “ affect the liability of the United States therefor.”