PIowry, Judge,
delivered the opinion of the court:
This is a petition for reimbursement from the United States under the act of January 20, 1885, 23 Stats., 283; 1 Supp., 471; 2 Supp., 1001. The principal question has never before been presented to the court.
It is alleged that the master at the time of the capture of the brigs was imprisoned, and while in durance vile was subjected to indignities, insufficiently fed, and deprived of the control of his vessels, and damaged for loss of occupation. Substantially the action is for false imprisonment, and to all intents and purposes the claim is for punitive damages.
It is not doubted that one government may claim compensation from another for wrongs done the persons of its citizens. International commissions are frequently consti *220 tuted to adjust injuries to the persons of one state by the authorities or through the negligence of another government. But here the inquiry is: What claims were released for a valuable consideration by the United States to France by the retrenchment of the second article of the treaty of 1800, and whether this court can report an award in the nature of an allowance for the injuries alleged to have been sustained.
The first mission sent to France to obtain indemnities for the losses of our citizens was without opportunity to conduct negotiations, because the existing Government refused to receive what was known as the Pinckney Commission. But claims were subsequently presented and negotiated on the part of the United States by the Ellsworth mission. The instructions which this last mission had as an indispensable condition of any treaty provided for a stipulation to make to the citizens of the United States “ full compensation for all losses and damages which they shall have sustained, by reason of irregular or illegal captures or condemnations of their vessels and other property, under color of authority or commissions from the French [Republic or its agents.” 2 Am. St. Pap., For. Rel., 302; Doc. 102, p. 561. As an ultimatum the instructions provided that if France would treat with us “ an article be inserted for establishing a board, with suitable powers to hear and determine the claims of our citizens, for the causes hereinbefore expressed, and binding France to pay or secure payment of the sums which shall be awarded.” 2 Am. St. Pap., 306; Doc. 102, p. 575.
It will be observed that the instructions related to captures or condemnations of property alone. There was no demand for damages arising out of wrongs committed upon the officers or crews of vessels captured or condemned. The American commissioners strictly followed the authority given to them. At the outset they presented to the French the project of a treaty to settle the differences which nearly resulted in war between France and the United States. The Americans’ first proposal related wholly to losses and damages to property. Subsequently our mission delivered to the French a written proposition that the indemnities sought were to be ascertained and secured “in the manner proposed in our *221 project of a treaty.” 2 Am. St. Pap., For. Rel., p. 328; Doc. 102, p. 620.
Paragraph II of the instructions to the Ellsworth Commission provided for the appointment of a board to examine and adjust all the claims similar to a board provided by the Jay treaty in the settlement of claims with Great Britain. The language of the Jay treaty was similar to the language employed in our proposals to France and related solely to “ irregular or illegal captures or condemnations of vessels and other property ” of our citizens. 8 Stat., 121. The United States also had a treaty with Spain for losses sustained by our citizens for illegal captures and condemnations of vessels and cargoes. This was in 1795 and was made to carry out the provisions of article 21 of our treaty with Spain. 8 Stat., 150.
Nowhere does it appear that there was any presentation or allowance of a claim for damages for false imprisonment under any of these treaties.
Though our Secretary of State did complain of the ill treatment of American seamen in communications .to Congress, and though with the Pinckney Commission there was an allusion to the violence done to the persons of our citizens, the language must be taken as an inducement to obtain compensation for losses of property.
In Gray's case, 21 C. Cls. R., 340, and in Gushing's case, 22 ibid., 1, this court incidentally referred to the claims surrendered as property claims only. The reason is manifest. If injuries to the person had been the subject matter of consideration in framing the matter of proposed liability, such claims could have been incorporated as a part of the retrenchment of the treaty only by having been subsequently presented to France.
In considering the Leghorn Seizures, 27 C. Cls. R., 239, this court said that the subject of diplomatic complaint between 1793 and 1800 was * * * imprisonment of American seamen by French tribunals to be read in the light of the negotiations set forth.
It must not be forgotten that at the outset our claims for the illegal capture of property did not constitute the principal object of our negotiations with France, but to secure *222 release from our guaranty to France of her territorial possessions in America.
When, pursuant to instructions, our commissioners were urging settlement, it was Napoleon who suggested that the national demands and privileges which France had possessed under a previous treaty between the two countries (which our Congress had undertaken to abrogate) be ended and that the “ just claims which America might have made for injuries done in time of peace ” be relinquished. That proposition was finally accepted by the two Governments, and Napoleon by it accomplished the suppression contained in the second article of the treaty which was finally made. That masterful mind is on record as stating that he fixed upon these two points as “ equiponderating ” propositions. There is nothing certain arising out of all the'negotiations that anything was expected or demanded by our Government beyond compensation for property losses. The shipping and commercial interests of this country alone were under consideration.
The title of the act of January 20, 1885, is for this court to ascertain the “ claims of American citizens for spolia-tions committed by the French prior to the thirty-first day of July, 1801.” Plunder taken in war is spoil. Spoliation is defined to mean the act of plundering, robbery, and the authorized act or practice of plundering neutrals at sea. It is true that the jurisdictional act itself must be examined in connection with the title. But the first section provides for consideraion for those who had “ valid claims to indemnity arising out of illegal captures, detentions, seizures, condemnations, and confiscations.” These words are limited by the proviso excluding from consideration “ such claims as were embraced in the convention between the United States and the French Republic concluded ” April 30, 1803, and “ such claims as were allowed, in whole or in part, under the provisions of the treaty between the United States and France concluded ” July 1, 1831, and “ such claims growing out of the acts of France as were allowed and paid, in whole or in part, under the treaty between the United States and Spain, concluded ” February 22, 1819.
*223 Beginning with the reports of Mr. Pickering (who was Secretary of State under the administrations of both President Washington and President Adams) and ending with the approval of the act of 1885 by President Arthur, the discussions related to indemnity for property spoliated and not to diplomatic claims for injuries done to persons sailing the seas. Chief Justice Marshall, while contending that there was the strongest obligation on our Government to compensate, restricted the contention to compensation for those whose vessels and cargoes had been despoiled. Clayton’s speech, 1846. Mr. Clay rested his contention for payment upon the rule of equity “ furnished by our Constitution” which provides that private property shall not be taken for public use without just compensation — making his contention so applicable as to entitle the injured citizen to consider his own country a substitute for the foreign power. The Meade case in 1821. Mr. Clay’s report was either preceded or followed by 44 other reports generally favorable for indemnity for property only. Many eminent in our public life concurred, including President Madison, Edward Livingston, Clinton, Everett, Webster, Cushing, Choate, Sumner. This court has said, however, that opponents were not wanting, among the most eminent of whom were Forsyth, Calhoun, Silas Wright, Benton, and President Polk, and President Pierce. In the three unfavorable reports the objectors put their opposition to indemnities of any kind.
The act for the payment of these claims discloses a majority of many more than two to one of those voting in the House of Representatives. Those supporting the measure include names from all sections of the country. Among many eminent in their day and time but no longer living-may be mentioned Culberson, Breckinridge, Broadhead, Dingley, Abram S. Hewitt, Oates, Thos. B. Reed, W. L. Wilson, and Jno. Randolph Tucker. The measure passed the Senate without a record vote. 16 Cong. Rec., 48th Cong.
A cash valuation had been put upon the claims of our merchantmen and vessel owners of a large sum. But later, France admitted a valuation of property spoliated of ten millions of francs. At the same time France was contending that by reason of the abrogation of our treaty with that *224 Government, France had sustained damages for a sum so great money could not compensate. She conceded that money should be paid for the destruction of the property rights of our citizens. By the settlement between the two countries the United States surrendered the diplomatic claims of our citizens for the relinquishment by France of that country’s national obligations against us. The personal injuries sustained by the officers and crews of our vessels were plainly ignored.
The terms “ illegal seizures ” and “ illegal captures ” and “ detentions ” can only mean the illegal seizure, capture, and detention of property.
The French spoliation act of January 20, 1885, like the Indian depredation act of 1891, did not provide for claims growing out of personal injuries. The United States, in assuming the payment of obligations for the taking, destruction, or appropriation of property were never considered liable for consequential damages.
The spoliation claims as a class were valid obligations from France to the United States, and our Government surrendered them to France for a valuable consideration benefiting the Nation, and this use of the claims raised an obligation founded upon right. The question presented at the time of the settlement was what constituted valid claims to indemnity upon the French Government for property. That question was international and not within the scope of ordinary inquiry. It was then, and is yet to be, measured by rules which relate to the rights and obligations of nations. Schooner Industry, 22 C. Cls. R., 3.
The jurisdictional act does not require that this court advise Congress as to the law enforceable in the courts, nor yet to abstract rights, but as to the law and equities which the lawmaking power shall deem proper to recognize.
But for the requirement to make a report this cause would be dismissed for want of jurisdiction without going into the merits. But under the statute the findings, together with a copy of this opinion, must be transmitted to Congress.
It is so ordered.